**Maladho Djehe DIALLO, Petitioner,**

v.

**Alberto GONZALES, Attorney General of the United States, Respondent.**

**Docket No. 04–4018–AG.**

United States Court of Appeals, Second Circuit.

Argued: Feb. 15, 2006.

Decided: April 26, 2006.

---

**5.** U.S. Trust argues that the prejudgment interest award should be adjusted for the same reason.

Thomas V. Massucci, New York, NY, for Petitioner.

Tanya Davis Wilson, Assistant United States Attorney, Middle District of Florida (Paul I. Perez, United States Attorney, Karin B. Hoppmann, Assistant United States Attorney, of counsel), Orlando, FL, for Respondent.

Before: KEARSE and SACK, Circuit

Judges, and STANCEU, Judge.*

SACK, Circuit Judge:

Maladho Djehe Diallo, a native and citizen of the Republic of Guinea, petitions for review of a decision of the Board of Immigration Appeals ("BIA") affirming the denial by an immigration judge ("IJ") of Diallo's application for asylum, withholding of removal, and relief under the Convention Against Torture[1] ("CAT"). Diallo contends that the IJ erred in failing to consider adequately her explanations for apparent inconsistencies among her written asylum application, her interview by an asylum officer, and her testimony before the IJ. She also contends that the asylum officer's summary of her asylum interview was unreliable, and that the IJ erred by not explicitly analyzing its reliability and by improperly faulting her for failure to produce corroborative evidence.

We disagree, and therefore deny the petition.

## BACKGROUND

### Diallo's Statements

Diallo entered the United States from Guinea as a nonimmigrant visitor on August 25, 2001. Some five months later, on January 23, 2002, she submitted a written application for political asylum and withholding of removal (the "original application"). In connection with that submission, on March 22, 2002, Diallo was interviewed by an asylum officer (the "asylum interview"). *See* 8 C.F.R. § 208.9 (providing for interview by an asylum officer as the first step in the adjudication of an asylum claim). The of-

ficer's written summary of that interview appears in the record. On May 16, 2002, Diallo supplemented her original application with an additional written statement. Nearly a year later, on April 24, 2003, she testified at a hearing before an IJ.

In each of the written and oral statements that she made during the course of the asylum process, Diallo alleged that she was persecuted by the Guinean government on account of her participation in the Union for a New Republic Party, an opposition political group. Diallo said that she joined the party, to which both her father and husband also belonged, in 1996, and that she remained an active party participant when the party joined the Union for Progress and Renewal ("UPR"), an opposition political coalition. Diallo said that in September 1997 she was suspended from school for wearing a T-shirt with the UPR insignia. During the Guinean presidential election of December 1998, she said, she was arrested at a demonstration against the regime and detained for two days, during which time she was beaten and interrogated. Diallo also testified that after her arrest, she was permanently expelled from public schools. In late 2000, Diallo said, she was again arrested and detained by the military. This time, her husband was arrested too.

Diallo appears to have given inconsistent accounts of what happened next. In her asylum interview of March 22, 2002, her supplemental application of May 16, 2002, and her testimony to the IJ on April 24, 2003, Diallo said that she was arrested in November 2000 and subsequently detained for five months, during which time she was subjected to unsanitary conditions and giv-

---

* The Honorable Timothy C. Stanceu, of the United States Court of International Trade, sitting by designation.

**1.** United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading

Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85. *See also* 8 C.F.R. § 208.16(c) (implementing regulations).

en inadequate food. In her original application of January 23, 2002, however, Diallo did not mention the detention. Instead, she wrote that "after rebels attacked Guinea, in September 2000, ... I was interrogated and released because I was sick, but my husband was detained for 8 months." The January 23 application does not describe any further detention.

Diallo also made apparently inconsistent statements regarding whether she had been raped. The summary of her asylum interview reports that she said that she had been raped some time between August 1996 and December 1998. But in neither of her asylum applications, one of which she submitted before the asylum interview and the other afterwards, did she say that she had been. And in her April 24, 2003, testimony before the IJ, Diallo explicitly denied having been raped.

*Diallo's Explanations for Her Inconsistent Statements*

At both her asylum interview and the hearing before the IJ, Diallo was questioned regarding the apparent inconsistencies in her asylum applications. According to the summary of the asylum interview, the asylum officer asked Diallo why she did not mention in her original application that she had been raped. Diallo reportedly answered that "she realized the information was missing *after* the application had been mailed to [the Immigration and Naturalization Service]." Assessment to Refer, Immigration and Naturalization Service, New York Asylum Office, dated March 22, 2002 (Gov.Ex. 11), at 2 (emphasis in original).

When Diallo did not mention her rape in her testimony, the IJ asked her to reconcile the omission with her reported statements at the asylum interview.

Q: ... [W]hy did you tell the asylum officer that you were raped?

A: That I was raped?

Q: Yes.

A: I, I did tell him that women there, the woman that I was with were raped.

Q: According to this, you said that you were raped.

A: To tell you the truth, I was not, I was not raped, and also I was in pain because I had just, I gave birth, it was not that long ago and I gave birth and I left my child with somebody else.

Q: Why would you tell someone you were raped if you weren't?

A: I did not know, I did not know where I was at that time, and I left my child with somebody else and I was worried about my child.

Tr. of Asylum Hearing, Apr. 24, 2003, at 45–46. The IJ also asked Diallo to explain why she did not indicate in her original asylum application that she had been detained for five months following her arrest by Guinean authorities in 2000. She responded: "I did tell the preparer. Maybe that preparer made a mistake and never mentioned." *Id.* at 42.

*The IJ's Decision*

Following a hearing, the IJ issued an oral decision finding that "there are far too many inconsistencies and contradictions in the evidence offered [ ] to consider the respondent a credible or reliable witness." Oral Decision of the IJ, dated Apr. 24, 2003, at 8–9. The IJ highlighted two primary inconsistencies: (1) Diallo's original application for asylum did not mention the five-month detention she later described; and (2) the asylum officer reported that Diallo told him during her asylum interview that she had been raped but she later indicated that she had never been raped. The IJ commented that Diallo had offered "little explanation" for the first discrepancy, and that her explanation for the second, in the course of the colloquy set forth

above, was "evasive and hesitant," "bordering on incoherent." *Id.* at 9.

The IJ also noted that Diallo "was unable to give much detail" regarding the platform of her political party and that "the only corroborating evidence the respondent has offered [regarding her political participation] is a card indicating that she was a member of the UPR and a letter." *Id.* at 9–10. From this, the IJ concluded that "[p]erhaps the respondent is a member of this party, but clearly, she does not have much knowledge of the party, or is not very active in the party." *Id.* at 10. Thus, the IJ concluded that "based on the respondent's lack of credibility and her failure to corroborate her claim, the Court finds that she has failed to meet her burden." *Id.*

*The BIA's Decision*

Diallo appealed the IJ's decision to the BIA. In a one-paragraph per curiam opinion, the BIA concluded that "the inconsistencies upon which the Immigration Judge based her decision are actually present in the record; the inconsistencies pertain to the salient points of the respondent's claims; and the inconsistencies provide a cogent basis for the adverse credibility determination." *In re Diallo,* A95 375 142, slip op. at 1 (BIA June 29, 2004). The BIA further stated that "the respondent failed to provide convincing explanations for the discrepant record either during the removal hearings or on appeal."[2] *Id.* The BIA therefore adopted and affirmed the decision of the IJ.

Diallo then brought this petition for review. She argues that the IJ erred in: (1) ignoring her explanations for the apparent inconsistencies in her story, (2) relying on the written summary of the asylum interview, and (3) requiring corroborative evidence without identifying specific pieces of evidence or showing that they were reasonably available to Diallo.

## DISCUSSION

### I. Standard of Review

When the BIA issues a brief opinion adopting an IJ's decision, we review the two decisions together—including "the portions [of the IJ's decision] not explicitly discussed by the BIA." *Yun–Zui Guan v. Gonzales,* 432 F.3d 391, 394–95 (2d Cir. 2005) (per curiam); *see also Secaida–Rosales v. INS,* 331 F.3d 297, 305 (2d Cir. 2003). We review the IJ's factual findings, including credibility determinations, for substantial evidence. *See id.* at 306–07. Under this standard, the IJ's factual determinations may be overturned only if "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

We have frequently considered how substantial the evidence must be in order for it to support an adverse credibility determination. In general, we "afford particular deference in applying the substantial evidence standard" to credibility findings, *Zhou Yun Zhang v. INS,* 386 F.3d 66, 73–74 (2d Cir.2004) (internal quotation marks omitted), because "the IJ's ability to observe the witness's demeanor places her in the best position to evaluate whether apparent problems in the witness's testimony suggest a lack of credibility or, rather, can be attributed to an innocent cause such as difficulty understanding the question," *Jin Chen v. U.S. Dep't of Justice* 426 F.3d 104,

---

2. It seems that by "removal hearings" the BIA intended to refer to Diallo's asylum hearing before the IJ, at which Diallo actually offered explanations for the discrepancies, rather than to her removal hearing, at which she conceded removability. Diallo's removal hearing contained no substantive discussion of her asylum claim and predated the IJ's finding of inconsistencies in the record.

113 (2d Cir.2005). But "the fact that the [agency] has relied primarily on credibility grounds in dismissing an asylum application cannot insulate the decision from review." *Ramsameachire v. Ashcroft*, 357 F.3d 169, 178 (2d Cir.2004). For an adverse credibility determination to be upheld, the factfinder must provide "specific, cogent reasons" that "bear a legitimate nexus to the finding," *Surinder Singh v. BIA*, 438 F.3d 145, 147 (2d Cir.2006) (per curiam) (internal quotation marks and citation omitted), and that are not based on "flawed reasoning, bald speculation, or conjecture," *Xiao Ji Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 158 (2d Cir.2006).

## II. Diallo's Inconsistent Statements

■ The IJ found Diallo not to be credible because of "inconsistencies and contradictions" in the statements she made during the asylum application process. Oral Decision at 8. It is well established that inconsistent statements made by the petitioner can constitute substantial evidence supporting an adverse credibility determination. *See Zhou Yun Zhang*, 386 F.3d at 77–78. Diallo contends, however, that her statements are not actually inconsistent. Pointing to the explanations for the apparent inconsistencies that she gave in her testimony to the IJ, she argues that any perceived contradictions in the record are artifacts of oversights and misunderstandings on the part of the individuals who recorded Diallo's statements. According to Diallo, the IJ erred by failing properly to consider or credit her explanations as to how these inconsistencies came about.

It is undisputed that the IJ gave Diallo the opportunity at the asylum hearing to explain the discrepancies among her original application, her asylum interview, and her testimony. We are therefore not asked to decide whether the IJ was required to seek an explanation for these apparent inconsistencies before relying on them to make an adverse credibility determination. *Compare Ming Shi Xue v. BIA*, 439 F.3d 111, 125 (2d Cir.2006) ("[A]n IJ may not rest an adverse credibility finding on non-dramatic putative contradictions or incongruities in an alien's narrative without first giving the applicant a chance to reconcile the testimony.") *with Majidi v. Gonzales*, 430 F.3d 77, 81 (2d Cir.2005) ("[We have never] required that an IJ, when faced with inconsistent testimony of an asylum applicant, must always bring any apparent inconsistencies to the applicant's attention and actively solicit an explanation.").

The issue we are required to address is whether the IJ, having solicited Diallo's explanations, erred by failing to consider them properly. We have previously concluded that a petition for review may be granted in the face of an adverse credibility decision by the IJ when she fails to "engage or evaluate" an asylum applicant's explanations for apparent inconsistencies in the record. *Latifi v. Gonzales*, 430 F.3d 103, 105 (2d Cir.2005) (per curiam). Such explanations are "significant factual assertions" that any reasonable adjudicator would consider in the course of making findings of fact. *Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 403 (2d Cir.2005). We have also concluded, however, that IJs need not "expressly parse or refute on the record each and every one of a petitioner's purported explanations for testimonial inconsistencies or evidentiary gaps." *Xiao Ji Chen*, 434 F.3d at 159 n. 13. In the case before us, the ultimate question we must answer, then, is whether the IJ has "specific[ally]" and "cogent[ly]" explained why, in light of the record as a whole, including Diallo's inconsistent statements and her explanations for them, Diallo's testimony could properly have been disbelieved. *Surinder Singh*, 438 F.3d at 147.

Here, as described, the IJ focused primarily on two inconsistencies in the record, both of which Diallo attempted to explain in her testimony at her asylum hearing.

Diallo testified that her original application for asylum contained no mention of her five-month detention in Guinea because the person who prepared the application failed to write down what she said. The IJ, in her oral decision, did not explicitly respond to this assertion; she stated only that Diallo had offered "little explanation" as to why the five-month detention was not mentioned in the original application. Oral Decision at 9. If Diallo's omission of her alleged five-month detention from her original asylum application were the only significant inconsistency at issue, the IJ's statement that Diallo had offered "little explanation" for the inconsistency would be troubling. Although the IJ did not "expressly overlook" Diallo's explanation for this first inconsistency, *Yun–Zui Guan*, 432 F.3d at 400, she can hardly be said to have "engage[d] or evaluate[d]" it, *Latifi*, 430 F.3d at 105.

As to her apparently inconsistent statements about rape, however, the IJ did "engage and evaluate" Diallo's explanation. Diallo characterizes her testimony before the IJ as indicating that she had not told the asylum officer at her asylum interview that *she* was raped, but rather that other women with her were raped. It is not clear from her statements at the hearing, however, that she in fact denied having stated that she was raped.

Q: ... [W]hy did you tell the asylum officer that you were raped?
A: That I was raped?
Q: Yes.
A: I, I did tell him that women there, the woman that I was with were raped.
Q: According to this, you said that you were raped.

A: To tell you the truth, I was not, I was not raped, and also I was in pain because I had just, I gave birth, it was not that long ago and I gave birth and I left my child with somebody else.

Q: Why would you tell someone you were raped if you weren't?

A: I did not know, I did not know where I was at that time, and I left my child with somebody else and I was worried about my child.

Tr. of Asylum Hearing, Apr. 24, 2003, at 46. Diallo's testimony that she told the asylum officer that other women were raped is not necessarily inconsistent with her also having stated that she was raped. And when the IJ asked her why she had falsely told the asylum officer that she was raped, Diallo failed to make clear that she had not. The IJ was not required to construe Diallo's testimony as denying that she had made inconsistent statements to the asylum officer.

Even if Diallo's testimony did, on its face, reconcile her apparently inconsistent statements, the IJ was not required to accept her explanation. Our case law makes clear that when an IJ considers an asylum applicant's explanations for apparent inconsistencies or contradictions in the record, the IJ is "not required to credit [them] even if they appear plausible on a cold record." *Cao He Lin*, 428 F.3d at 403; *see also Yun–Zui Guan*, 432 F.3d at 399 (upholding adverse credibility finding when IJ "explicitly acknowledged the full extent of [petitioner's] explanation for her statements ... before finding [it] unpersuasive"). The question we face is whether the IJ's adverse credibility finding was supported by substantial evidence. It was. We do not think that "any reasonable adjudicator would be compelled" to reject the IJ's stated reasons for discrediting Diallo's explanations. 8 U.S.C. § 1252(b)(4)(B).

We are therefore bound to accept the IJ's finding on this score.

Moreover, the report of the asylum interview rendered it particularly difficult for the IJ to infer that Diallo had not told the asylum officer that she herself had been raped. The report states that Diallo was asked at the interview why she had not mentioned her rape in her written asylum application. In response to that follow-up question by the asylum officer, she did not say that she had not in fact been raped. Instead, she responded that "she realized the information was missing *after* the application had been mailed to [the] INS." Gov. Ex. 11, at 2 (emphasis in original). At the hearing before the IJ, however, Diallo responded to a similar question by admitting that she had not been raped. The IJ was entitled to infer from this that Diallo had testified untruthfully either to the asylum officer or to the IJ. The IJ's refusal to credit Diallo's explanation for her statements about rape is thus supported by the record as a whole. And the consideration and rejection of Diallo's attempt to explain one of the two major inconsistencies in the record is sufficient to support the adverse credibility determination. *See Xiao Ji Chen*, 434 F.3d at 159 n. 13.

III. Reliance on the Asylum Interview

■ Diallo argues that even if the discrepancy between the statements she made at her asylum interview and before the IJ would ordinarily be enough to support an adverse credibility determination, it is insufficient in this case because the interview was not reliable. Diallo relies primarily on *Matter of S–S–*, 21 I. & N. Dec. 121, 1995 WL 688875 (BIA 1995), discussed further below, and on *Ramsameachire, supra*, in which we stated that factfinders should exercise caution before finding asylum applicants non-credible based on inconsistent statements made at airport interviews immediately upon entering the United States. *See Ramsameachire*, 357 F.3d at 179–80. She contends that the IJ erred in relying on the asylum interview and in failing to analyze its reliability prior to using it as a basis for an adverse credibility determination.

As an initial matter, we note that Diallo's asylum interview was different from the airport interview discussed in *Ramsameachire*. Asylum interviews are conducted by asylum officers as the first step in the adjudication of an alien's written asylum application. *See* 8 C.F.R. § 208.9. Airport interviews, by contrast, take place when an alien is deemed inadmissible immediately upon entering the United States and indicates an intention to apply for asylum or a fear of persecution. *See* 8 U.S.C. § 1225(b)(1) (providing for inadmissible aliens to be removed unless they indicate an intention to apply for asylum or a fear of persecution, in which case they are interviewed by an asylum officer to determine whether their fear of persecution is credible); *see also Ramsameachire*, 357 F.3d at 175 (petitioner underwent airport interview after entering the United States with a fraudulent passport and being deemed inadmissible). We think there are good reasons to treat asylum interviews and airport interviews differently.

It is largely because an airport interview "takes place immediately after an alien has arrived in the United States, often after weeks of travel," we have said, that "the BIA and reviewing courts" must scrutinize its reliability with particular care. *Ramsameachire*, 357 F.3d at 179. The alien, moreover, "is not represented by counsel, and may be completely unfamiliar with United States immigration laws and the elements necessary to demonstrate eligibility for asylum." *Id.* And "because those most in need of asylum may be the most

wary of governmental authorities, ... an alien may not be entirely forthcoming in the initial interview." *Id.*

We do not think that, as a general matter, these considerations apply with equal force to asylum interviews. Such interviews take place after the alien has arrived in the United States, has taken the time to submit a formal asylum application, and has had the opportunity to gather his or her thoughts, to prepare for the interview, and to obtain counsel. It therefore appears that the imperative to "closely examine" the reliability of asylum interviews is not as pressing as it is in the airport interview context. *Id.*

This is not to say, of course, that the BIA and reviewing courts are not required carefully to consider the reliability of asylum interviews. Of course they are. As with other materials in the asylum record, factfinders should accord to them the weight that they merit in light of the record as a whole, and we should review the resulting factual determinations for substantial evidence. But in light of the differences between asylum interview and airport interviews, and in light of the former's integral role in the asylum process prescribed by federal regulations, we think that asylum interview interviews do not call for *special* scrutiny, as airport interviews do.

We think that the IJ was justified in treating Diallo's asylum interview report as reliable in this case. The BIA's decision in *Matter of S–S–*, relied on by Diallo, provides useful guidance for analyzing the reliability of such reports. There, the BIA concluded that notes of two interviews conducted by an asylum officer provided "an inadequate basis for assessing [an] adverse credibility finding." *Matter of S–S–*, 21 I. & N. Dec. at 123. Finding that the notes were "obviously the informal, personal notations of the asylum officer that were

never intended to be a formal summary of the interview," and that they were "randomly organized, cryptic to all but the note-taker, and partially illegible," the Board determined that they were of "little value in evaluating the applicant's credibility." *Id.*

The BIA continued:

When, as in these asylum proceedings, the applicant's credibility is placed in issue because of alleged statements made at the asylum interview, our review requires a reliable record of what transpired at that interview. This record might be preserved in a hand-written account of the specific questions asked of the applicant and his specific responses to those questions. Such question and answer statements could be signed by the applicant as an accurate summary of the interview. Alternatively, a suitable record could be produced through transcription of an electronic recording of the asylum interview. At a minimum, the record must contain a meaningful, clear, and reliable summary of the statements made by the applicant at the interview. The Board needs to know what transpired in the proceedings before the asylum officer before we can evaluate questions with respect to credibility arising from the interview.

*Id.* at 123–24.

It does appear that the record of Diallo's asylum interview was deficient in one important respect: It summarizes Diallo's responses without describing "the specific questions asked" or recording the interview verbatim. *Id.* at 124. We think that the interview record nevertheless meets the "minimum" standard of *Matter of S–S–* in that it "contain[s] a meaningful, clear, and reliable summary of the statements made by [Diallo] at the interview." *Id.* The record of Diallo's interview contrasts

sharply with the "randomly organized, cryptic," and "partially illegible" notes described in *Matter of S–S–*. *Id.* at 123. The typewritten summary clearly and in detail describes Diallo's statements regarding her nationality, the circumstances of her entry into the United States, and each of the events that she alleges constitute past persecution and grounds for fear of future persecution. Other than the ambiguous and relatively narrow issue discussed above regarding her statement that she had been raped, *see* Part II, *supra,* Diallo does not allege that the summary misrepresents her statements at the interview. It seems to us that, notwithstanding the asylum officer's failure to provide a verbatim transcript or to record the questions asked, the interview summary provides sufficiently reliable information as to "what transpired in the proceedings before the asylum officer" for the BIA and reviewing courts to "evaluate questions with respect to credibility arising from the interview." *Matter of S–S–,* 21 I. & N. Dec. at 123.[3] The IJ was therefore justified in relying on it.

## IV. Corroborating Evidence

 Diallo argues, finally, that the IJ and the BIA impermissibly relied on the lack of corroborating evidence to discredit Diallo's testimony. To be sure, in order to deny asylum for want of sufficient corroboration, an IJ must "(a) identify the particular pieces of missing, relevant documentation, and (b) show that the documentation at issue was reasonably available to the petitioner." *Jin Shui Qiu v. Ashcroft,* 329 F.3d 140, 153 (2d Cir.2003) (citing *Diallo v. INS,* 232 F.3d 279, 285–90 (2d Cir.2000)). But, as we have explained:

> The requirement for corroborative documents' "identification" and "availability" articulated in *Jin Shui Qiu* ... pertains when the IJ or BIA cites inadequate corroboration as a basis for denying asylum to an applicant who is otherwise credible. That is not this case. If [the petitioner's] failure to produce the identified corroboration were excused, what would remain would be (1) the IJ's finding that [the petitioner's] "inconsistent testimony ... seriously undermines the applicant's truthfulness and credibility before the Court," and (2) the BIA's finding that "important discrepancies" in the evidence "are indicative of an overall lack of veracity on the part of the applicant." Such adverse credibility findings, by themselves, constitute substantial evidence to support the conclusion that [the petitioner] failed to carry his burden of proof on his persecution claim.

---

**3.** This conclusion is supported by *Ramsameachire*. There, addressing the more difficult question of the reliability of airport interviews, we did not suggest that a paraphrased record of an asylum applicant's statements will always be unreliable. Rather, we identified three other factors that should also be considered in determining an interview's reliability: whether the questions were "designed to elicit the details of an asylum claim," whether the applicant seemed "reluctant to reveal information" to her interviewer, and whether "the alien's answers to the questions posed suggest that the alien did not understand English or the translations provided by the interpreter." *Ramsameachire,* 357 F.3d at 180 (internal quotation marks omitted);

*but see Yun–Zui Guan,* 432 F.3d at 396 ("[W]e do not regard these factors as essential to be assessed in every case, but simply as helpful matters to be considered where appropriate."). As noted, in the present case, the asylum officer appears to have elicited the details of Diallo's asylum claim, and there is no indication in the record of the interview that Diallo was reluctant to reveal information—indeed the problem is that she said too much—or that Diallo had trouble understanding the asylum officer or her interpreter. In short, the interview does not seem to implicate any of the "reasons [for] which ... *Ramsameachire* [] require[d] that airport interviews be viewed with caution." *Latifi,* 430 F.3d at 105.

*Zhou Yun Zhang,* 386 F.3d at 78–79 (citations and emphasis omitted); *cf. Cao He Lin,* 428 F.3d at 404 (addressing corroboration in light of the IJ's flawed adverse credibility determination).

Here, the IJ found Diallo's testimony to contain "far too many inconsistencies and contradictions" to be credited, and stated that as a result she did not "believe much of what [Diallo] told the Court." Oral Decision at 8–9. Having disregarded Diallo's testimony as not credible, the IJ then concluded that the remaining evidence did not suffice to establish by a preponderance of the evidence that Diallo had been persecuted, had a well-founded fear of future persecution, was likely to be persecuted in the future, or was likely to be tortured. *Id.* at 10. In context, it is clear that the IJ did not deny Diallo's claim "for want of sufficient corroboration," *Jin Shui Qiu,* 329 F.3d at 153, but concluded instead that because Diallo's testimony was incredible she had failed to prove her eligibility for relief. Diallo does not, nor could she seriously, contest that *if* her testimony was properly discredited, she is ineligible for relief. In light of our conclusion that the IJ's adverse credibility determination was supported by substantial evidence, we conclude that Diallo was appropriately denied asylum, withholding of removal, and CAT relief.

## CONCLUSION

For the foregoing reasons, the petition for review is denied.