**San Chung JO, Petitioner,**

v.

**Alberto GONZALES, Attorney General, Department of Homeland Security, Respondents.**

**Docket No. 05–2774–AG.**

United States Court of Appeals, Second Circuit.

Argued: April 24, 2006.

Decided: July 27, 2006.

Stuart Altman, New York, NY, for Petitioner.

Robert L. Rawls, Assistant United States Attorney, Beaumont, TX (Matthew D. Orwig, United States Attorney for the Eastern District of Texas, Beaumont, TX, on the brief), for Respondents.

Before WALKER, Chief Judge, and KEARSE and WINTER, Circuit Judges.

KEARSE, Circuit Judge.

Petitioner San Chung Jo, a native and citizen of the People's Republic of China ("China"), seeks review of a May 13, 2005 decision of the Board of Immigration Appeals ("BIA") affirming a December 18, 2003 decision of an Immigration Judge ("IJ") that denied his application for relief from removal from the United States pursuant to the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted* Dec. 10, 1984, *entered into force for the United States* Nov. 20, 1994, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85 ("Convention Against Torture" or "CAT"), *implemented by* Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. No. 105–277, div. G, Title XXII, § 2242, 112 Stat. 2681–761, 2681–822 ("FARRA") (codified at 8 U.S.C. § 1231 note (2000)). In his petition for review, Jo contends principally that the IJ lacked substantial evidence to support her finding that Jo failed to establish that he would more likely than not be tortured upon return to his homeland. For the reasons that follow, we deny the petition.

## I. BACKGROUND

Jo entered the United States on or about January 30, 2001. On February 13, 2001, the Immigration and Naturalization Service served him with a Notice to Appear, charging that he was an immigrant who lacked valid entry documents and was thereby subject to removal from the United States pursuant to § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act, as amended ("INA"), 8 U.S.C. § 1182(a)(7)(A)(i)(I). Jo conceded removability, and he initially applied for asylum and withholding of removal pursuant to INA §§ 208 and 241(b)(3), 8 U.S.C. §§ 1158 and 1231(b)(3), as well as for relief under CAT, claiming that if he were returned to China he would be fined and imprisoned on account of his past opposition to China's coercive family planning policies. He later filed an amended statement in support of his claim, adding, *inter alia,* that because of his illegal departure from China and his opposition to the family planning policies, the Chinese authorities would also subject him to torture.

Thereafter, Jo requested and received permission to withdraw his applications for asylum and withholding of removal; Jo conceded that his claim of difficulties with China's family planning officials was fabricated. He asserted that the real reason he feared returning to China was that he had come to the United States with the aid of smugglers, known as Snakeheads; that if he were returned to China he would be unable to pay off the substantial debt he still owed the Snakeheads; and that if he did not pay, the Snakeheads would harm or torture him and his family. The written statement submitted by Jo in support of this assertion included the following:

I ... borrowed sixty thousand dollars at a high interest rate to come to the United States to help family. I still owe half this money to the [s]mugglers. If I am sent back to China there will be no way to pay this money. I then fear that these smugglers could harm or torture me for not repaying the money. I be-

lieve they will also harm my family and destroy my home if I am not able to pay. I do not know for sure if these smugglers work with the Chinese Government but I strongly suspect the[y] do. The reason is they do their practice out in the open and the Chinese Government would not allow[ ] them to do this so freely if they weren't involved with it. (Jo's Amended Statement dated October 22, 2003.) Jo pursued this claim as a basis for relief under the Convention Against Torture.

At an evidentiary hearing, the IJ questioned Jo about the basis of his fear of the Snakeheads. Jo testified that he had paid half of his debt to the smugglers (*see* Hearing Transcript, December 18, 2003 ("Tr."), at 31); that he would be unable to pay the remainder if he were returned to China because work is difficult to find and salaries in China are low (*see id.* at 38); and that he feared that if he failed to repay the Snakeheads, his parents "will be beaten up, and my, the things in the house will be destroyed" (*id.* at 37). Jo testified that if he thereafter still failed to make repayment, "they will kill my parent" (*id.* at 38). The IJ asked Jo what evidence he had that the Snakeheads would harm or kill him or his parents if he were returned to China, and Jo's testimony was as follows:

Q. .... How do you know that the Snakeheads will come after you if you are returned to China?

A. Because similar thing happen to my neighbor. So that's how I know.

Q. Tell me what happened to your neighbor.

A. Also in the same situation, the person came through, came to the United States through it. And then demanded to send money back.

Q. And what happened?

A. He, it was demanded to make the payment but because no money then

forced, forced he or him or her, them, to make the money, make the payment.

Q. And then what happened.

A. Then it was resulted in the, in the pulling down of the house.

Q. And then what happened?

A. Then when the house was pulled down, they had no house to live in.

Q. Anything else?

A. Well more or less like this, then the parents had no house to live, then they have to move, move away.

Q. Anything else?

A. Even they moved away but the Snakeheads was determined to find you out. Then after they locate them the Snakehead make the same demand to make the payment.

Q. Then?

A. Then they moved again, well then I have no more idea about what happened next.

(Tr. 39–40.)

In response to further questioning, Jo testified that the Snakeheads did not wear uniforms and that he did not know whether they worked for the Chinese government. (*See id.* at 43.) Jo's counsel conceded that the Snakeheads "don't work for the Chinese Government." (*Id.* at 44.)

In an oral decision dated December 18, 2003 ("IJ Decision"), the IJ denied Jo's application for relief under CAT, finding, for two reasons, that Jo had not established that it was more likely than not that he would be subjected to torture in violation of CAT if he were returned to China. First, the IJ noted that to be eligible for relief under CAT, the alien must show that the anticipated torture would be "at the instigation of, with the acquiescence of, or through the wilful omission of a public official or one acting in an official capacity." IJ Decision at 4. Although finding that Jo's testimony as to his indebtedness

to the Snakeheads was credible, the IJ was unpersuaded that the Snakeheads were part of the Chinese government. Second, assuming that the Snakeheads were part of the government, the IJ noted that the only evidence that Jo had presented as to the Snakeheads' response to nonpayment of debt was that his neighbors' house had been pulled down and the neighbors had had to move away. The IJ concluded that this "description ... as to what happens to people who are returned does not rise, in the Court's mind, ... to the kind of harm that is torture—extreme punishment contemplated by the Torture Convention." IJ Decision at 6. The IJ stated that, while "cruel, destroying someone's home" does not, within the meaning of CAT, constitute "torture." *Id.* Accordingly, the IJ concluded that Jo had not shown his entitlement to relief under CAT.

Jo appealed the IJ Decision to the BIA. In a brief per curiam opinion dated May 13, 2005, the BIA adopted and affirmed the IJ Decision. This petition for review followed.

## II. DISCUSSION

On this petition for review, Jo contends that the IJ's ruling that he had not shown that it was more likely than not that he would be subjected to torture if returned to China was not supported by substantial evidence. We do not view this case as turning on a question of evidentiary sufficiency. Rather, the IJ, giving full credence to all nonspeculative evidence presented by Jo, ruled that the type of retribution as to which Jo presented evidence does not constitute "torture" within the meaning of CAT. That was an application of law to fact, which we review *de novo*, *see, e.g., Ramsameachire v. Ashcroft*, 357 F.3d 169, 178 (2d Cir.2004); *Diallo v. INS*, 232 F.3d 279, 287 (2d Cir.2000); *see also Diallo v. Gonzales*, 445 F.3d 624, 628 (2d Cir.2006) (where the BIA issues a brief opinion

adopting and affirming the ruling of the IJ, we review the two decisions together). For the reasons that follow, we see no error.

■ In seeking relief under the Convention Against Torture, an alien bears the burden of proving that, "if removed to the proposed country of removal," "it is more likely than not that he or she would be tortured." 8 C.F.R. § 208.16(c)(2). At issue here is not whether Jo proved it more likely than not that he would be treated in the manner in which he testified that others in his circumstances had been treated, but rather whether the type of treatment he showed—deprivation of a home—falls within the meaning of "torture." CAT itself defines "torture" as follows:

> For the purposes of this Convention, the term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

Convention Against Torture art. 1, ¶ 1.

The United States Senate ratified CAT subject to certain stated "understandings," which include the following with respect to the meaning of "torture":

> (1)(a) That with reference to Article 1 [of CAT], the United States understands that, in order to constitute torture, an act must be specifically intended to in-

flict severe physical or mental pain or suffering and that mental pain or suffering refers to prolonged mental harm caused by or resulting from: (1) the intentional infliction or threatened infliction of severe physical pain or suffering; (2) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (3) the threat of imminent death; or (4) the threat that another person will imminently be subject to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

(b) That the United States understands that the definition of torture in Article 1 is intended to apply only to acts directed against persons in the offender's custody or physical control.

Senate Resolution of Ratification of the Convention Against Torture, 136 Cong. Rec. 36,192, 36,198 (1990) ("Senate Resolution") ¶ II(1)(a) and (b). Congress authorized the appropriate federal agencies to prescribe regulations to implement the obligations of the United States under CAT in accordance with these understandings. *See* FARRA § 2242(b).

The regulations promulgated by the Attorney General, governing matters pertaining to immigration, begin by adopting nearly verbatim the definition of torture that appears in Article 1 of CAT, and add clarifying elaborations:

### § 208.18 Implementation of the Convention Against Torture.

(a) *Definitions.* The definitions in this subsection incorporate the definition of torture contained in Article 1 of the Convention Against Torture, subject to the reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.

(1) Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

(2) *Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture.*

(3) Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions. Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture.

(4) *In order to constitute torture, mental pain or suffering must be prolonged mental harm caused by or resulting from:*

(i) The intentional infliction or threatened infliction of severe *physical* pain or suffering;

(ii) The *administration or application, or threatened administration or application, of mind altering substances or other procedures* calculated

to disrupt profoundly the senses or the personality;

(iii) The *threat of imminent death;* or

(iv) The threat that another person will imminently be subjected to *death,* severe *physical pain or suffering,* or the *administration or application of mind altering substances or other procedures* calculated to disrupt profoundly the sense or personality.

(5) In order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture.

(6) *In order to constitute torture an act must be directed against a person in the offender's custody or physical control.*

(7) Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity.

8 C.F.R. § 208.18(a)(1)-(7) (emphases added).

As indicated by each part of the above definition, the concept of torture has its focus on injury to persons, rather than on damage to property. For example, reflecting the understanding explicitly stated in the Senate's ratification of CAT, the regulations specify that "[i] n order to constitute torture," the act must be directed "against a person" and that that person must be "in the offender's custody or physical control," 8 C.F.R. § 208.18(a)(6); *see* Senate Resolution ¶ II(1)(b).

■ Further, although the definition of torture includes the infliction of pain that is mental rather than physical, and the loss of property, especially of one's home, can of course cause mental anguish, the regulations make clear that in order to come within the definition of torture, the mental anguish must have its origin in the treatment, actual or threatened, of a person. As quoted above, the regulations provide that in order for the infliction of "mental pain or suffering" to constitute torture, it must be, *inter alia,* "caused by or resulting from" either the "infliction or threatened infliction of severe *physical* pain or suffering," or the "threat of imminent *death,*" or the "*administration or application,* or threatened administration or application, *of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality.*" 8 C.F.R. § 208.18(a)(4) (emphases added). These regulations leave no room for the proposition, advanced by Jo, that the CAT concept of torture encompasses simple deprivations of property. *See also Kyaw Zwar Tun v. INS,* 445 F.3d 554, 567 (2d Cir.2006) (noting that although confiscations of property could be sufficiently severe to constitute persecution, a claim of "torture requires proof of something more severe than the kind of treatment that would suffice to prove persecution"). The regulations' definition of torture makes clear that for the infliction of mental pain to constitute torture, that pain must have its origin in the actual or threatened infliction of harm on a person.

Although Jo argues that reports of the United States Department of State relating to China indicate that smugglers often exact payment from those smuggled aliens who are indebted to them by, *inter alia,* forcing the aliens to work long hours after their arrival in other countries, confiscating their travel documents, and threatening to retaliate against their families in China if they protest, those reports provide no information as to smugglers' treatment of aliens who have been returned to China.

In sum, we see no indication in the definition of torture that that concept was intended to encompass destruction, thefts, expropriations, or other deprivations of property. Accordingly, we see no error in the IJ Decision, adopted by the BIA, that the destruction of a home—the only consequence as to which Jo presented evidence—does not constitute torture within the meaning of CAT.

## CONCLUSION

Jo's brief in support of his petition also adverts tersely to a due process claim. As no such claim was presented to the BIA, it is not properly before us. We have considered all of Jo's arguments that are properly before us and have found them to be without merit. The petition for review is denied.