**Matilda SHEHAJ, Petitioner**

v.

**ATTORNEY GENERAL OF the UNITED STATES, Respondent.**

No. 08–3812.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Nov. 16, 2009.

Opinion filed: Dec. 22, 2009.

Charles Christophe, Esq., Christophe & Associates, New York, NY, for Petitioner.

Ari Nazarov, Esq., Ann C. Varnon, Esq., United States Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before: AMBRO, ALDISERT and ROTH, Circuit Judges.

## OPINION

AMBRO, Circuit Judge.

Matilda Shehaj petitions for review of an August 2008 decision of the Board of Immigration Appeals dismissing her appeal of the Immigration Judge's order of removal.

We grant her petition.[1]

### I.

Shehaj, a native and citizen of Albania, entered the United States in September 2004 by way of Toronto, Canada. She applied for asylum in the United States in September 2005 based on her fear that she would be forced into prostitution if she returned to Albania. In November 2005, the Department of Homeland Security charged Shehaj with being removable as an alien present in the United States without having been admitted or paroled. 8 U.S.C. § 1182(a)(6)(A)(i). During an April 2006 hearing, Shehaj conceded removability and elected to proceed with her asylum application and also to seek withholding of removal and protection under the Convention Against Torture.

The IJ held a hearing on Shehaj's application in July 2006. Shehaj testified that, at the age of 15, she began a romantic relationship with a 24–year old man named Albert Meli. Meli was the first man Shehaj was romantically involved with, and Shehaj kept her relationship with Meli a secret from her family. When Shehaj's cousin, Edmond Shehaj, found out about the relationship, he warned Shehaj that Meli's family trafficked women for prostitution. Edmond believed that Meli's uncle, Sokol Meli, was a trafficker who lived in Italy, where Edmond also lived. Shehaj testified that she believed Edmond's story because Meli refused to talk with Shehaj about his family.

After learning this information, Shehaj told Meli what she had learned about his family and attempted to end the relationship. According to Shehaj, Meli admitted to her that he was a trafficker, professed his love for her, and told her, "I will take you, [and] there is no way and no one [who] could do anything to me." Shehaj testified that she and her family did not tell the police their fears about Meli because they believed the police were connected with prostitution traffickers, which she learned from the news in Albania. Shehaj testified that she knew of other girls from her village, including a classmate, who were kidnapped and never found by the police.

According to Shehaj, Meli's threatening phone calls persisted, and Edmond finally recommended to Shehaj's mother that it would be "best if [Shehaj] doesn't have a phone." Edmond later met with Meli, and, following this meeting, recommended to Shehaj's mother and brothers that Shehaj leave Albania so that Meli could no longer threaten her. Shehaj's family agreed, and her brothers living in Greece raised $20,000 to send her to the United States. Shehaj submitted affidavits from her mother, brother, and sister-in-law that corroborated her story about Meli and the decision to raise money to pay for Shehaj to flee the country.

Shehaj testified that in May 2005, after she entered the United States but before she filed for asylum, her cousin Edmond was murdered in Florence, Italy. Shehaj and her family believed that Sokol Meli killed Edmond because he had urged Shehaj to flee Albania. During the July 2006 hearing, Shehaj submitted Edmond's Albanian death certificate (which did not list the cause or location of death) and an Italian newspaper article concerning Ed-

---

1. The BIA had jurisdiction under 8 C.F.R. § 1003.1(b). We have jurisdiction under 8 U.S.C § 1252(a).

mond's death, which, although poorly translated, reported that Sokol Meli was a focus of the inquiry.

During the hearing, the Government introduced a two-page record of an airport interview conducted by Canadian border officials who detained Shehaj when she arrived in Toronto. This record (entitled "Examining Officer Notes") reflects that Shehaj told the officials that there was a "blood war" between her family and another Albanian family, that someone from that family was "bothering" her, and that she feared they would try to smuggle her into Italy. Shehaj also told Canadian officials that her uncle and two of her cousins were killed by the other family. When the IJ confronted Shehaj with the record from the airport interview, Shehaj admitted that her story about the "blood war" was not completely truthful. Although Shehaj maintained that there was, in fact, a feud between her family and another Albanian family, and that her uncle and two cousins had been killed in the feud, Shehaj admitted that the feud was political in nature and had nothing to do with her.[2] When asked why she had lied to the Canadian officials, Shehaj explained that the "snakehead" who accompanied her to Canada told her that she should say anything, "even stupid things," so that the officials would release her.

The IJ stated that he was "unfortunately compelled" to find Shehaj incredible be-cause of her admission that she had lied to the Canadian officials. The IJ accordingly denied Shehaj's claims for asylum, withholding of removal, and CAT protection on that basis. The IJ noted that, aside from Shehaj's untruthful statements during her airport interview, she had "a very strong case" for asylum, as her testimony was "consistent with country reports about problems that exist in Albania."[3] Although the IJ denied Shehaj's claims, he granted Shehaj's request for voluntary departure.

On appeal, the BIA held that the IJ's adverse credibility determination was not clearly erroneous and dismissed Shehaj's appeal. The BIA agreed that "the crucial fact [was] that [Shehaj] admitted that she lied to Canadian officials and fabricated a story so that she would be released." The BIA also stated that Shehaj "made no mention, as she now claims, of a fear of being trafficked and forced into prostitution."

Shehaj filed a timely petition for review of the BIA's decision.[4]

## II.

Where "the BIA both adopts the findings of the IJ and discusses some of the bases for the IJ's decision, we have authority to review the decisions of both the IJ and the BIA." *Chen v. Ashcroft,* 376 F.3d 215, 222 (3d Cir.2004); *see also Xie v.*

2. Shehaj stated in an affidavit submitted to the IJ that her grandfather had been a "high-ranking law enforcement official under the [regime] of former King Zogu of Albania," and that, following the Communist takeover of Albania, her family was "severely mistreated ... and ... labeled an enemy of the state."

3. The 2005 State Department Country Report on Human Rights Practices in Albania, which Shehaj submitted in support of her asylum application, notes that Albania "remain[s] a source country for trafficking of women and children for the purposes of sexual exploita-tion and forced labor." The main form of recruitment was "marriage under false pretenses or false promises of marriage." The State Department Country Report also states that "police were often involved directly or indirectly in trafficking," but few were investigated or charged with crimes, as traffickers frequently were able to "manipulate[ ] lawyers and judges and bribe[ ] their way out of punishment."

4. In October 2008, we granted Shehaj's motion for a stay of removal.

*Ashcroft,* 359 F.3d 239, 242 (3d Cir.2004). Adverse credibility determinations are factual findings that we review under the substantial evidence standard, *Xie,* 359 F.3d at 243; we must uphold a credibility determination unless "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *Xie,* 359 F.3d at 243. However, the IJ must provide "specific, cogent reasons" for his or her findings, and adverse credibility determinations based on "speculation or conjecture, rather than on evidence in the record, are reversible." *Dia v. Ashcroft,* 353 F.3d 228, 249 (3d Cir.2003) (*en banc*) (*quoting Gao v. Ashcroft,* 299 F.3d 266, 272, 276 (3d Cir. 2002)).

Under the REAL ID Act of 2005, credibility determinations may be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." Pub.L. No. 109–13, § 101(a)(3)(B)(iii), 119 Stat. 231, 303 (2005) (codified at 8 U.S.C. § 1158(b)(1)(B)(iii)).[5] However, an adverse credibility determination may only be made after "[c]onsidering the totality of the circumstances, and all relevant factors," which may include "the consistency between the applicant's ... written and oral statements ... and ... the circumstances under which the statements were made." *Id. See also Lin v. Mukasey,* 534 F.3d 162, 167 (2d Cir.2008) (holding that, under the REAL ID Act, "an IJ may rely on *any* inconsistency or omission in making an adverse credibility determination as long as the 'totality of the circumstances' establishes that an asylum applicant is not credible") (emphasis in original).

### III.

In his oral decision, the IJ identified three grounds for his adverse credibility determination: (1) Shehaj's testimony that Meli never physically abused her; (2) Shehaj's failure to submit a police report concerning her cousin's death; and (3) Shehaj's inconsistent statement to Canadian authorities at the Toronto airport. Understandably, neither of these first two grounds was discussed by the BIA, as each relates to whether Shehaj presented sufficient evidence in support of her claims, not her credibility. *See Chen v. Gonzales,* 434 F.3d 212, 221 (3d Cir.2005) ("[I]t is clear that the BIA's own rule requires a credibility determination to be independent of an analysis of the sufficiency of an applicant's evidence."); *Abdulai v. Ashcroft,* 239 F.3d 542, 551 n. 6 (3d Cir.2001) ("A failure of proof is *not* a proper ground per se for an adverse credibility determination. The latter finding is more appropriately based upon inconsistent statements, contradictory evidence, and inherently improbable testimony.") (emphasis in original).

That leaves the inconsistency between Shehaj's airport interview and her testimony before the IJ as the sole basis for the IJ's adverse credibility determination. Importantly, the IJ appears to have found Shehaj credible during the hearing, noting that Shehaj had been "candid and honest" during her testimony, and had "readily admitted" that she had lied to Canadian border officials. The IJ nonetheless determined that he "ha[d] to [make] a negative credibility finding" in light of Shehaj's admission that she had not been truthful with Canadian authorities. In so reasoning, the IJ failed to consider whether "the totality of the circumstances[ ] and all relevant factors" supported the adverse credibility determination. 8 U.S.C. § 1158(b)(1)(B)(iii). In particular, the IJ did not address (much less discredit) Shehaj's explanation for her false statements

---

**5.** The REAL ID Act applies to Shehaj's claims because her application was filed after the Act's effective date (May 11, 2005). Pub.L. No. 109–13 § 101(h)(2), 119 Stat. at 305.

during the airport interview, or explain why that explanation was inadequate. *See, e.g., Singh v. Gonzales,* 439 F.3d 1100, 1106 (9th Cir.2006) ("Because 'an adverse credibility finding is improper where an IJ fails to address a petitioner's explanation for a discrepancy or inconsistency,' this testimony does not provide substantial evidence to support an adverse credibility determination.") (*quoting Kaur v. Ashcroft,* 379 F.3d 876, 887 (9th Cir.2004)); *Diallo v. Gonzales,* 445 F.3d 624, 629 (2d Cir.2006) ("[A] petition for review may be granted in the face of an adverse credibility decision by the IJ when she fails to 'engage or evaluate' an asylum applicant's explanations for apparent inconsistencies in the record.") (*quoting Latifi v. Gonzales,* 430 F.3d 103, 105 (2d Cir.2005)).

The IJ's adverse credibility determination is particularly problematic because he relied solely on inconsistent statements made during Shehaj's airport interview. "It is established in this Circuit that inconsistencies between an airport statement and an asylum seeker's testimony before an IJ is not sufficient, standing alone, to support a BIA finding that the petitioner was not credible." *Fiadjoe v. Att'y Gen.,* 411 F.3d 135, 159 (3d Cir.2005) (*citing Balasubramanrim v. INS,* 143 F.3d 157, 164 (3d Cir.1998)). We have disfavored reliance on statements made during an airport interview because "[s]uch an interview is likely to be hurried; language difficulties arise; the results may be inaccurately recorded[;] and an arriving alien who has suffered abuse in his home country may be reluctant to reveal full information in his or her first meeting with the government." *Id.*

Many of the problems with airport interviews that we identified in *Fiadjoe* apply to Shehaj's airport interview. First, Shehaj—who was only 17 years old at the time—testified that she was "disoriented" during the interview and could not understand all the questions. Shehaj did not have counsel during the interview, and, although an interpreter was present, he or she apparently participated over the phone.[6]

Second, it is apparent that the record of the airport interview is incomplete. Although Shehaj testified that the interview lasted approximately two hours, the record is only one-and-a-half pages long, and lists only 22 total questions and answers. Moreover, the sequence of questions reflected in the officer notes confirms that the entire interview was not recorded. For example, immediately following a question regarding who Shehaj wished to be her legal guardian, the border official asked Shehaj to identify the people who wanted to "smuggle[ ] [her] into Italy." This is the first reference to "smuggling" in the officer notes, which strongly suggests that a substantial portion of the interview was not recorded. On the basis of this record, it is impossible to know whether Shehaj also mentioned her fear of being forced into prostitution during the interview.[7] Accordingly, to the extent the IJ and the BIA relied on the fact that Shehaj had not told Canadian authorities about

---

**6.** The record from the airport interview bears the words "signed by phone" under "interpreter."

**7.** Neither the IJ nor the Government asked Shehaj whether she mentioned her fear of being forced into prostitution during the airport interview. During his closing statement, Shehaj's counsel highlighted the incomplete nature of the airport interview record, and

argued that it was "very possible that there was a discussion off the record about the problem that [Shehaj] discusse[d] today before the court."

The IJ rejected Shehaj's argument, noting that Shehaj could have requested additional records from Canadian officials if she believed the record was incomplete. The examining officer notes, however, appear to confirm that they are the complete record of the

her fear of being forced into prostitution, that finding is not supported by the record. *See Dia,* 353 F.3d at 249.

Finally, even assuming that Shehaj omitted her fear of being forced into prostitution during her airport interview, we do not believe that omission, by itself, required the IJ to find Shehaj incredible. In this context, it is quite possible that a 17–year old female might be hesitant to disclose to border officials in a foreign country her fears of being forced into prostitution. *See, e.g., Fiadjoe,* 411 F.3d at 159 ("Finding herself in a strange place before a male officer it is not surprising that Ms. Fiadjoe would be unable to discuss the shameful and taboo incidents of incestuous rape."); *see also Ramsameachire v. Ashcroft,* 357 F.3d 169, 179 (2d Cir.2004) ("[B]ecause those most in need of asylum may be the most wary of governmental authorities, the BIA and reviewing court must recognize, in evaluating the statements made in an interview, that an alien may not be entirely forthcoming in the initial interview."). Accordingly, the inconsistency between Shehaj's statements to Canadian officials and her testimony before the IJ, which included her "honest and candid" admission that she had not

been truthful during her airport interview, hardly required a finding that Shehaj was not credible.

\*     \*     \*     \*     \*     \*

In sum, we conclude that the IJ's and BIA's adverse credibility determination is not supported by substantial evidence. In so holding, we are not finding Shehaj credible. *Dia,* 353 F.3d at 260. Rather, we conclude that "because of the lack of substantial evidence to support the adverse credibility determination, we [must] remand in order for the [BIA] to further explain or supplement the record." *Id.*; *see also Senathirajah v. INS,* 157 F.3d 210, 222 (3d Cir.1998) (remanding to BIA with instructions to remand to IJ for decision on asylum and withholding of removal, but without consideration of prior erroneous adverse credibility findings). Accordingly, we grant Shehaj's petition for review, vacate the BIA's decision, and remand[8] for further proceedings consistent with this opinion on Shehaj's claims for asylum, withholding of removal, and relief under the CAT.[9]

interview: the bottom of the first page says "page 1 of 2," and the bottom of the second page says "page 2 of 2." The IJ did not address Shehaj's argument that, in light of the apparent completeness of the record, it was unlikely there was any other record available. *Cf. Abdulai,* 239 F.3d at 554 (in analyzing whether an asylum applicant has failed to present sufficient corroborating evidence, the IJ must engage in an "analysis of whether the applicant has adequately explained" the absence of a particular corroborating record). In this context, it does not appear that the IJ conducted any independent analysis of whether the record of the airport interview was sufficiently reliable. *See Ramsameachire v. Ashcroft,* 357 F.3d 169, 179 (2d Cir.2004) ("[T]he BIA and reviewing courts must closely examine each airport interview before concluding that it represents a sufficiently accu-

rate record of the alien's statements to merit consideration in determining whether the alien is credible.").

8. In September 2008, Shehaj's brother, Artur Shehaj, was granted asylum based on his fear that, should he return to Albania, he would be persecuted for helping Shehaj flee the country. In November 2009, Shehaj filed a motion to remand on this ground, or in the alternative, to hold our decision in abeyance pending a possible stipulation between the parties regarding a remand. Because we grant Shehaj's petition for review, we deny her motion to remand as moot.

9. The Government argues that we should affirm the denial of Shehaj's claim under the CAT because "both the Board and the immigration judge considered Shehaj's CAT pro-

tection claim apart from her asylum and withholding of removal claims." *See Zubeda v. Ashcroft*, 333 F.3d 463, 476 (3d Cir.2003) ("[C]laims for relief under the [CAT] are analytically separate from claims for asylum ... and for withholding of removal under [the INA].") (*quoting Kamalthas v. INS*, 251 F.3d 1279, 1283 (9th Cir.2001)). Although the IJ separately addressed Shehaj's CAT claim in his oral decision, he simply stated that, "[f]or the reasons detailed above, [Shehaj's] claims are not credible," and that Shehaj had "failed to present any additional evidence to indicate she is more likely than not to be tortured if removed to Albania." The BIA merely restated the IJ's conclusion in its opinion. In these circumstances, we cannot help but conclude that the IJ's erroneous adverse credibility determination impermissibly "ble[d] through to the BIA's [and the IJ's] consideration of [Shehaj's] claim under the [CAT] without further explanation." *Id.* Accordingly, we also vacate the BIA's denial of Shehaj's claim for CAT relief.