**Yun–Zui GUAN, Petitioner,**

v.

**Alberto R. GONZALES, United States Attorney General,\* Respondent.**

**Docket No. 03–40574–AG.**

United States Court of Appeals, Second Circuit.

Argued: Dec. 8, 2005.

Decided: Dec. 23, 2005.

---

\* United States Attorney General Alberto R. Gonzales is substituted as Respondent. See    Fed. R.App. P. 43(c)(2).

Thomas V. Massucci, New York, NY.

Susan Lindquist, Assistant United States Attorney (Timothy M. Burgess, United States Attorney for the District of Alaska, on the brief), United States Attorney's Office for the District of Alaska, Anchorage, AK.

Before: NEWMAN, CABRANES, and HALL, Circuit Judges.

PER CURIAM.

We consider here whether (1) in an instance where the BIA agrees with the IJ's adverse credibility determination and, without rejecting any of the IJ's grounds for decision, emphasizes particular aspects of that decision, we may base our decision on a ground of the IJ's decision not explicitly discussed by the BIA; and (2) in the circumstances presented, adverse credibility findings of the BIA and IJ were based on substantial evidence insofar as they relied on inconsistencies between petitioner's account of persecution in an airport interview and her subsequent testimony before the IJ.

## BACKGROUND

Yun–Zui Guan ("Guan"), a native and citizen of the People's Republic of China ("China"), petitions for review of an August 23, 2003 decision of the Board of Immigration Appeals ("BIA"). The BIA affirmed a November 8, 2001 decision of an immigration judge ("IJ") which denied petitioner's application for asylum, withholding of removal to China, and protection under Article 3 of the United Nations Convention Against Torture ("CAT").[1]

In proceedings before the IJ, Guan alleged that on approximately seven or eight occasions between April 1998 and June 1999, Chinese police confiscated property from the clothing store that she operated. Guan asserted that following a June 1, 1999 incident in which police officers purloined a large amount of merchandise, she mailed a letter the next day to city government officials complaining of corruption among the police and local authorities. According to Guan, one week later, on June 9, 1999, police destroyed her store to punish her for having filed a complaint and threatened to arrest her if she did so again. Guan testified that on June 10, 1999, she closed her store, and that on June 14, 1999, she participated in a brief demonstration against the city government, at which she carried a sign protesting government corruption. Guan claimed that on June 16, 1999, she was told by her mother not to return home from her boyfriend's house (where she had gone to stay following her demonstration) because "there were police coming to arrest" her. To avoid being arrested and detained, Guan allegedly fled to a rural village before emigrating from China to the United States in September 1999.

The IJ's decision was based on her finding that Guan's testimony was not credible. The IJ "listened to [petitioner's] testimony ... looked at the documentary evidence, and considered the [petitioner's] demeanor," and on this basis concluded that petitioner's testimony was "confusing and contradictory, vague and lacking in detail ... [as well as] unconvincing." Tr. of Oral Decision of the Immigration Judge, at 4. To substantiate her conclusions, the IJ referred to Guan's denial of having told immigration officials at the airport in Los Angeles that she left China because she

1. United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Apr. 18, 1988, S. Tresty Doc. No. 100–20, 1465 U.N.T.S. 85.

didn't want to get married and to Guan's confusing "testimony ... as to the date that she actually did close the store." *Id.* The IJ also added, without elaborating, that she "found it very difficult to believe that the [petitioner] would go and demonstrate against the government with the sign." *Id.* at 4–5.

The BIA "agree[d] with the [IJ]'s ultimate conclusion that the [petitioner] did not meet her burden of demonstrating eligibility for [the requested] forms of relief," Order of the BIA, at 1, but elaborated upon the IJ's reasoning. As the basis for its agreement with the IJ's assessment that the petitioner's testimony was "confusing and contradictory, vague and lacking in detail," the BIA listed (1) the fact that petitioner "could not explain who came to collect fees and who took the clothes from her boutique; (2) petitioner's inconsistent testimony about the date on which she allegedly wrote a letter to the city government;[2] and (3) petitioner's contradictory testimony about the date on which she permanently closed her store.[3] *Id.*

## DISCUSSION

■ Where, as here, the BIA agrees with the IJ's conclusion that a petitioner is not credible and, without rejecting any of the IJ's grounds for decision, emphasizes particular aspects of that decision, we will review both the BIA's and IJ's opinions— or more precisely, we review the IJ's decision including the portions not explicitly discussed by the BIA. *See Fiadjoe v. Att'y Gen.*, 411 F.3d 135, 152–53 (3d Cir.2005) (holding that where the BIA has relied in its opinion on an IJ's adverse credibility analysis, a Court of Appeals may review

both opinions); *Xin Jie Xie v. Ashcroft*, 359 F.3d 239, 242 (3d Cir.2004) (same); *cf. Xue Hong Yang v. U.S. Dep't of Justice*, 426 F.3d 520, 522 (2d Cir.2005) (noting that where the BIA declines to adopt portions of an IJ's reasoning but affirms the IJ's decision in every other respect, we review "the judgment of the IJ as modified by the BIA's decision—that is, minus the single argument for denying relief that was rejected by the BIA"); *Yan Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir.2005) ("Where the BIA adopts the decision of the IJ and merely supplements the IJ's decision ... we review the decision of the IJ as supplemented by the BIA.") (citing *Niam v. Ashcroft*, 354 F.3d 652, 655 (7th Cir.2004)).

■ We review an IJ's factual findings, including adverse credibility determinations, under the substantial evidence standard. *See* 8 U.S.C. § 1252(b)(4)(B) ("[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be *compelled* to conclude to the contrary .... ") (emphasis added); *Zhou Yun Zhang v. INS*, 386 F.3d 66, 73 (2d Cir.2004) ("[W]e will not disturb a factual finding if it is supported by 'reasonable, substantial, and probative' evidence in the record when considered as a whole.") (internal quotation marks omitted).

■ We afford " 'particular deference to the credibility determinations of the IJ.' " *Wu Biao Chen v. INS*, 344 F.3d 272, 275 (2d Cir.2003) (quoting *Montero v. INS*, 124 F.3d 381, 386 (2d Cir.1997)). Accordingly, our review does not permit us to engage in an independent evaluation of the cold record or ask ourselves whether, if we were sitting as fact finders, we would credit or

---

**2.** Petitioner alter natively stated that she wrote the letter on June 2, 1999 and on June 9, 1999.

**3.** Petitioner alternatively testified that she closed her store "in the end of June" and on June 10, 2005—one day after police allegedly "destroyed" the store in retaliation for petitioner's letter to the city government.

discredit an applicant's testimony. *See Zhou Yun Zhang*, 386 F.3d at 74 ("[T]he [reviewing] court may not itself hypothesize excuses for ... inconsistencies [in a petitioner's testimony], nor may it justify the contradictions or explain away the improbabilities. Its limited power of review will not permit it to 'reverse the BIA simply because [it] disagree[s] with its evaluation of the facts.'") (internal quotation marks omitted, last alteration in original) (quoting *Jin Shui Qiu v. Ashcroft*, 329 F.3d 140, 149 (2d Cir.2003)). "Where the IJ's adverse credibility finding is based on specific examples in the record of inconsistent statements by the asylum applicant about matters material to his claim of persecution, or on contradictory evidence or inherently improbable testimony regarding such matters, a reviewing court will generally not be able to conclude that a reasonable adjudicator was compelled to find otherwise." *Id.*

■ Of course, "the fact that the [agency] has relied primarily on credibility grounds in dismissing an asylum application cannot insulate the decision from review." *Ramsameachire v. Ashcroft*, 357 F.3d 169, 178 (2d Cir.2004). An adverse credibility determination must be based on "specific, cogent reasons" that "bear a legitimate nexus" to the finding. *Zhou Yun Zhang*, 386 F.3d at 74 (internal quotation marks omitted) (quoting *Secaida–Rosales v. INS*, 331 F.3d 297, 307 (2d Cir.2003) (internal quotations omitted)). Inconsistent testimony often bears a legitimate nexus to an adverse credibility finding, but it need not be fatal if it is minor and isolated, and the testimony is otherwise generally consistent, rational, and believable. *See Diallo v. Immigration & Naturalization Service*, 232 F.3d 279, 288 (2d Cir.2000).

At oral argument, counsel for the Government declined to rely on contradictory statements made by petitioner concerning the precise dates on which she allegedly sent a letter of protest to city government officials and closed her clothing store for fear of further retribution by local police. We therefore set aside petitioner's statements concerning the chronology of events and consider whether other more significantly inconsistent statements relied upon by the IJ and BIA provide sufficient support for their adverse credibility findings.

In an airport interview conducted immediately after petitioner's entry into the United States—which occurred less than three months after the events giving rise to her claim—petitioner was asked, under oath, "Why did you leave your home country or country of last residence?," to which she replied: "Because of the blind marriage. I refused and now they are trying to get me." Next, petitioner was asked "Do you have any fear or concern about being returned to your home country or being removed from the United States?," to which she replied, in a sworn statement: "Yes, [they] will put me in jail because I refused to marry." When asked "[w]hat [was] the purpose of [her] entry into the United States," petitioner stated that it was "to be with [her] father" who had applied to obtain legal resident status for petitioner. At the conclusion of her interview, petitioner was asked whether she "ha[d] any questions" or if there was "anything else [she] would like to add," to which she replied "No." In her airport interview, petitioner made no mention of having owned a store in China, having protested against local government corruption, or having suffered persecution as a result of such activities. In fact, petitioner first told immigration authorities about her outspoken protests against police corruption and resulting persecution in May 2000 on her I–589 form, which was submitted more than nine months after her entry into the United States.

When the IJ later questioned Guan about her airport interview statements, she denied telling immigration authorities that she left China to avoid the prospect of a blind marriage; instead she claimed to have cited, as the basis for her departure, the fact that the Chinese government would not permit her to marry at age 21. When the IJ asked Guan if her inability to marry was "why [she] came to the U.S.," she responded that "the most important" reason was her desire to flee persecution stemming from the closure of her clothing store. At no point did Guan explain why she failed to mention this "most important" reason in her airport interview, when the same question was posed of her.

■ We exercise caution when reviewing statements made within the context of airport interviews, recognizing that because such interviews *"may* be perceived ... as coercive or threatening," aliens may "not be *entirely forthcoming* in the initial interview." *Ramsameachire,* 357 F.3d at 179 (emphasis added). Of course, an IJ is not precluded from relying on an alien's testimony in an airport interview. *Id.* at 180 (acknowledging that after "examining the record of [an] airport proceeding as a whole ... and concluding that it represents a reliable source of the alien's statements and actual beliefs," an IJ may rely on airport interview testimony in making adverse credibility findings). Rather, we "closely examine each airport interview" to ensure that it "represents a sufficiently accurate record of the alien's statements to merit consideration in determining whether the alien is credible." *Id.* at 179.

■ In assessing the reliability of airport interview testimony, we may take into account (1) whether the "record of the interview ... merely summarizes or para-

phrases the alien's statements [rather than providing] a verbatim account or transcript," (2) whether the questions posed to the alien seem "designed to elicit the details of an asylum claim," (3) whether "the alien appears to have been reluctant to reveal information to INS officials because of prior interrogation sessions or other coercive experiences in his or her home country," and (4) whether "the alien's answers to the questions posed suggest that the alien did not understand English or the translations provided by the interpreter." *Id.* at 179–80. Importantly, we do not regard these factors as essential to be assessed in every case, but simply as helpful matters to be considered where appropriate. Reviewing a factfinder's determination of credibility is ill-suited to attempts to fashion rigid rules of law. *Cf. Inwood Labs., Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 855, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) (district court findings of fact are upheld unless appellate court "is left with the definite and firm conviction that a mistake has been committed") (internal quotation marks omitted).

■ Upon our review of the record of Guan's sworn statements in her airport interview, we conclude that (1) Guan's remarks were transcribed verbatim, rather than merely summarized, (2) the questions posed to Guan afforded her ample opportunity to describe, or at least mention, any fear of persecution she may have had in connection with her recent public criticism of the local government,[4] (3) Guan gave no indication either in her airport interview or in her subsequent hearing before the IJ that she was "reluctant to reveal information to INS officials because of prior interrogation sessions" or past "coercive experiences," and (4) there is no evidence that Guan failed to understand the questions

4. When asked in her airport interview, "Do you have any questions or is there anything

else you would like to add?," petitioner replied "No."

posed to her due to problems with translation[5].

We described the airport interview in *Ramsameachire* as "non-coercive and careful," and concluded, on this basis, that "[t]he BIA was ... entitled to rely on the airport interview as a source of Ramsameachire's statements." *Id.* at 181–82. There, we noted that:

> At the beginning of the interview, the INS officer explained to [petitioner] that "U.S. law provides protection to certain persons who face persecution ... upon return to their home country. If you fear ... being sent home, you should tell me so during this interview because you may not have another chance." The interview did not proceed until [petitioner] indicated that he understood the officer's statement and his rights under United States law. Moreover, [petitioner] was provided with [an] interpreter, and was specifically asked if he could understand him or her, alleviating any concern that he was not able to understand the proceedings, or make himself understood. [Petitioner] was asked questions that were clearly designed to elicit a potential basis for an asylum

claim, such as whether he would be harmed on his return and why ....
Moreover, the record of his statement bears hallmarks of accuracy and reliability, as it is typewritten, signed by [petitioner], and initialed by him on each page.

*Id.* at 181.

Guan's airport interview was nearly identical to the airport interview that we endorsed in *Ramsameachire*: (1) the INS officer read Guan an identical statement concerning her rights under U.S. law and exhorting her to provide a full account of any persecution she may have suffered in China, (2) Guan was promptly provided with an interpreter and asked to confirm that she could understand the proceedings, and (3) Guan signed and initialed the interview transcript after indicating that her answers were "true and correct" and that her "statement is a full, true, and correct record of [her] interrogation." Where, as here, there is no indication that an alien's testimony has been coerced,[6] unfairly truncated, or mistranslated[7] in any material way, it is entirely appropriate that a factfinder consider such testimony when making a credibility assessment because it

---

**5.** During her airport interview, Guan clearly stated that she understood what the INS officer had explained to her about the nature of the proceeding, and she later confirmed that her responses to the questions posed were "a full, true and correct record of [her] interrogation" by the INS officer.

**6.** Even had Guan suggested that she felt coerced in the course of her airport interview, we noted in *Ramsameachire* that a petitioner's "attempts to reconcile the differences between his airport statements and his later testimony by asserting that he was nervous about speaking to INS officials at the airport" do not preclude the BIA from relying on such statements when making an adverse credibility finding, provided that there is also evidence that the alien "understood the purpose of the interview." *Ramsameachire,* 357 F.3d at 181–82. Thus, while the IJ and BIA should

not overlook complaints of coercion altogether, *see Latifi v. Gonzales,* 430 F.3d 103, 2005 WL 3074137 (2d Cir. Nov. 17, 2005), 2005 U.S.App. LEXIS 24669, at *3, an alien's mere recitation that he was nervous or felt pressured during an airport interview will not automatically prevent the IJ or BIA from relying on statements in such interviews when making adverse credibility determinations.

**7.** Although Guan suggested, in her hearing before the IJ, that her testimony concerning the blind marriage had been mistranscribed, she did not dispute that her prior explanations for seeking asylum in the United States were, in any event, purely marriage-related. In other words, Guan does not argue that she made any mention of her encounters with Chinese police or her store closure during her airport interview.

represents the alien's own unpolished and unrevised description of the events giving rise to his claim of asylum, and because the alien's recollection of the events giving rise to the asylum claim is freshest at the point of entry into the United States.

■■■ In *Ramsameachire*, we cautioned that where a petitioner was largely, but not "entirely," forthcoming in an airport interview, he should not, on that basis alone, be deemed not credible. *See Ramsameachire*, 357 F.3d at 179. In a similar vein, where a petitioner's account of persecution before an IJ differs only in "insignificant and trivial" respects from an account that he previously provided, we will decline to accept such inconsistencies as a proper basis for an adverse credibility finding. *See Latifi v. Gonzales*, 430 F.3d 103, 2005 WL 3074137 (2d Cir. Nov. 17, 2005), 2005 U.S.App. LEXIS 24669, at *5 (analyzing differences between a petitioner's account of persecution in a "credible fear" interview and his later account in a hearing before an IJ). Where two accounts of persecution share a basic resemblance, but are said to contain certain inconsistencies, an IJ should be specific as to the nature of those inconsistencies, rather than simply adverting, in a generalized fashion, to the presence of inconsistencies with the expectation that a reviewing court will undertake to decipher which aspects of the two accounts are genuinely inconsistent. *See id.*

■■■ We have never held, however, that where a petitioner provides two *entirely different* accounts of persecution—the first in the context of an airport interview, and the second during the course of a hearing before the IJ—that the IJ may not, when making a credibility determination, consider the fact of a petitioner's failure to mention the core elements of his later persecution claim at the time of his entry into the United States. On the contrary, where, as here, a petitioner has provided two distinct, non-overlapping accounts of persecution, an IJ will be unable to point to any "specific inconsistencies" between these accounts because the accounts are inconsistent *in toto*. In such circumstances, an IJ must instead rely on the commonsense observation that it is inconsistent for a petitioner to respond to the same question about the nature of his asylum claim with two entirely different responses.

"[T]he weight accorded to any inconsistencies between the alien's interview statements and his or her subsequent assertions will depend on the nature of the variances...." *Ramsameachire*, 357 F.3d at 180. Where "an alien's answers during the airport interview *provide* a *less detailed account* of the alien's experiences than his or her subsequent asylum application and testimony," such "minor factual discrepancies ... may simply reflect the fact that the alien has had the chance to parse his or her experience more carefully or refresh his or her recollection after the initial interview." *Id.* (emphasis added). By contrast, "[w]here the alien's airport statements and his or her later testimony present *materially different accounts of his or her purported persecution*, ... the inconsistencies may render the alien's testimony incredible." *Id.* at 180–81 (emphasis added).

■■■ Upon our review of the record, we hold that the IJ and BIA did not err in basing their adverse credibility findings on inconsistencies between Guan's account of persecution at the time of her airport interview and her later account before the IJ. Where, as here, immigration officials have been presented with two "materially different" asylum claims, it is entirely appropriate for a factfinder to rely on this evidence as a basis for determining whether a petitioner was actually persecuted in the manner asserted or is instead merely reciting an account fabricated for the purposes of obtaining entry into the United

States. Such evidence, no less than a factfinder's assessment of a petitioner's demeanor as a witness, provides a crucial means of distinguishing between valid and invalid—or more accurately, persuasive and unpersuasive—claims of persecution. Because in the space of nine months Guan completely altered her explanation for fleeing China, and because these inconsistencies concerned matters that "went to the heart of [her] asylum claim," *Ramsameachire*, 357 F.3d at 182, we reject Guan's contention that these contradictions are "so minor, isolated and immaterial as to be unacceptable bases for a negative credibility finding," Pet'r's Br. at 14.

The facts of this case strongly resemble those in *Ramsameachire*, where petitioner "at the airport interview ... indicated that he feared persecution if he returned to Sri Lanka because of his status as a returned asylum seeker, [but] in his asylum application, hearing testimony, and legal arguments ... focused solely on his fear of ethnic persecution." *Ramsameachire*, 357 F.3d at 182. There, we held that "[i]f he had indeed been arrested because he was a Tamil, *he could have asserted as much in response to the airport interviewer's questions about his fear of harm.*" *Id.* (emphasis added). Because Ramsameachire's "airport statements paint[ed] a very different picture than his testimony and written asylum application," we concluded that "[t]he BIA was therefore justified in finding [his] account of his treatment at the hands of the Sri Lankan authorities incredible [and concluding] that [he] had not suffered past persecution, and had no gen-

uine subjective fear of future persecution." *Id.* For the same reasons we relied upon in *Ramsameachire*, Guan's failure to mention in her airport interview the closure of her business, her protest activity, and her resulting persecution, provided substantial evidence to support the adverse credibility findings of the IJ and BIA.

Our recent decision in *Latifi*—excusing inconsistencies between a petitioner's statements during an airport interview and his subsequent testimony before the IJ—does not suggest a contrary result here. *Latifi*, 430 F.3d 103, 2005 WL 3074137, 2005 U.S.App. LEXIS 24669 at *5, *8. In that case, the petitioner provided an explanation for the inconsistencies, stating that at the airport interview he felt "afraid and pressured, and did not know whether any harm would come to him if he mentioned his political situation." *Id.* at *5. Because this explanation fell "squarely within the category of reasons which, as we stated in *Ramsameachire*, require that airport interviews be viewed with caution" and, more importantly, because the IJ erroneously stated "that [petitioner] gave no reason for why he was not forthcoming in his airport interview," *id.* at *3, and thus failed to "evaluate" that explanation, *id.* at *5, we held that the inconsistencies between the airport interview and his later testimony could not support the IJ's adverse credibility finding, *id.* at *5, *8.[8]

Here, the IJ explicitly acknowledged the full extent of Guan's explanation for her statements concerning marriage in the airport interview before finding Guan's explanation unpersuasive.[9] Because the IJ did

---

**8.** We underscore that *Latifi* does not stand for the proposition that an IJ may not rely on an alien's statements in an airport interview whenever that alien asserts that during his airport interview he felt "afraid and pressured, and did not know whether any harm would come to him if he mentioned his political situation." As long as the IJ acknowledges and evaluates this explanation before

making an adverse credibility finding, he may still rely on airport interview testimony in such circumstances.

**9.** The IJ noted that

[Guan] was asked if she remembered being questioned at the airport and if she had said that she left China because she didn't want [to be] married. She said that that wasn't

not expressly overlook any explanation offered by petitioner for the inconsistencies in question, she did not err in the manner described in *Latifi*.[10]

In light of the plain inconsistencies between petitioner's account of persecution in the airport interview and her subsequent testimony before the IJ, we hold that the adverse credibility findings at issue here were fully supported by substantial evidence. We further conclude that, on the basis of their adverse credibility findings, the IJ and BIA correctly determined that Guan also failed to meet her burden under the more stringent test for withholding of removal, and that she did not demonstrate that "it is more likely than not that he would be tortured if removed to the proposed country of removal." 8 U.S.C. § 208.16(c)(2); *see also Wang v. Ashcroft*, 320 F.3d 130, 133 (2d Cir.2003).[11]

## CONCLUSION

In sum, we hold that

(1) where the BIA agrees with the IJ's conclusion that a petitioner is not credible and, without rejecting any of the IJ's grounds for decision, emphasizes particular aspects of that decision, we will review both the BIA's and the IJ's opinions, and rely on portions of the IJ's decision not explicitly discussed by the BIA; and

(2) in the circumstances presented, the adverse credibility findings of the BIA and IJ were based on substantial evidence inasmuch as they relied on inconsistencies between petitioner's account of persecution in an airport interview and her subsequent testimony before the IJ.

\* \* \* \* \* \*

We have reviewed Guan's remaining arguments and find them to be without merit. Accordingly, we DENY Guan's petition, as well as Guan's pending motion for a stay of removal.

the case, and in fact, in China, they wouldn't let her get married when she was 21. However, she said the most important reason that she left China was because of the business. Tr. of Oral Decision of the IJ, at 4.

10. In *Latifi*, we also excused "purported discrepancies" between petitioner's credible fear interview and his hearing testimony, *Latifi*, 430 F.3d 103, 2005 WL 3074137, 2005 U.S.App. LEXIS 24669, at \*3, because the IJ ignored elements of the petitioner's testimony that were consistent with the credible fear interview and failed to "identify any specific inconsistencies," *id.* at \*4–\*5, between the credible fear interview and later testimony. Here, however, there are no elements common to the two accounts and the inconsistencies are not merely "purported," but plain and undisputed: Guan's first account concerned her desire to flee oppressive marriage, while her second account concerned persecution arising from the closure of her clothing business by corrupt local police.

11. Although neither the IJ nor the BIA properly analyzed Guan's CAT claim, we need not reach that issue because Guan has waived her right to contest that portion of the BIA's order by failing to challenge on appeal the denial of CAT relief.