07-0327-ag
Zhang v. Holder

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

September Term, 2007

(Heard: January 16, 2008                    Decided: October 30, 2009)

Docket No. 07-0327-ag

MING ZHANG, JA YUN ZHANG,

    *Petitioners,*

    v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL OF THE UNITED STATES,

    *Respondent.*[*]

Before: KEARSE, LEVAL, and CABRANES, *Circuit Judges.*

Petitioners appeal an agency decision denying them asylum, withholding of removal, and relief under the Convention Against Torture. We conclude, in a case of first impression in our Circuit, (1) that an agency may consider the record of a "credible fear" interview when evaluating an alien's credibility and (2) that substantial evidence supports the agency's determination that petitioner Ming Zhang did not testify credibly about the basis for her application for relief.

The petition for review is denied.

> VLAD KUZMIN, Kuzmin & Associates, P.C., New York, NY, *for Petitioners.*
>
> REGAN C. HILDEBRAND, Office of Immigration Litigation (Peter D. Keisler, Assistant Attorney General, Lisa Arnold, Senior Litigation Counsel, Keith McManus, Trial

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Eric H. Holder, Jr. is automatically substituted for former Attorney General Alberto Gonzales as respondent in this case.

Attorney, and Shaole Green, Attorney/Law Clerk, Office of Immigration Litigation, *on the brief*), Civil Division, U.S. Department of Justice, Washington, DC, *for Respondent*.

JOSÉ A. CABRANES, *Circuit Judge*:

Petitioner Ming Zhang ("petitioner") and her minor son Ja Yun Zhang, natives and citizens of the People's Republic of China, seek review of a December 27, 2006 order of the Board of Immigration Appeals ("BIA") denying their applications for asylum, withholding of removal, and relief under the Convention Against Torture.[1] *In re Zhang*, Nos. A 96 425 876, A 96 425 877 (B.I.A. Dec. 27, 2006); *In re Zhang*, Nos. A 96 425 876, A 96 425 877 (Immig. Ct. N.Y. City June 29, 2005). On appeal, Ming Zhang contends, *inter alia*, that it was error for the agency to determine—based, in part, on inconsistencies between her testimony at her removal hearing and the statements that she made at her airport interview and "credible fear" interview—that she had not testified credibly about the basis for her petition for relief. The circumstances under which an immigration judge ("IJ") or the BIA may consider the record of a credible fear interview when evaluating an alien's credibility is a matter of first impression in our Circuit.[2]

---

[1] Ming Zhang's claims are based on her alleged resistance to family planning policies in China. Ja Yun Zhang's application is based on the application filed by his mother. *See* 8 U.S.C. § 1158(b)(3)(A) ("A spouse or child . . . of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying . . . such alien.").

[2] An individual is interviewed several times when applying for asylum. For some types of interviews, we have previously held that the BIA and IJ may consider statements made at the interview.

An airport interview occurs shortly after an arriving alien has been deemed inadmissible to the United States. *See* 8 C.F.R. § 235.3. Our Court has already determined that, under certain circumstances, the BIA and IJ may consider statements made during an airport interview. *See Guan v. Gonzales*, 432 F.3d 391, 396 (2d Cir. 2005); *Ramsameachire v. Ashcroft*, 357 F.3d 169, 175 (2d Cir. 2004).

A credible fear interview occurs after an airport interview if, at the airport interview, "an alien . . . indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country." 8 C.F.R. § 235.3(b)(4). We have not yet determined whether the BIA and IJ may consider statements made at this interview.

We have also determined that, under certain circumstances, the BIA and IJ may consider statements made during an asylum interview. *See Diallo v. Gonzales*, 445 F.3d 624, 632 (2d Cir. 2006). An asylum interview occurs after an alien has filed a formal application for asylum. *See id.*; 8 C.F.R. § 208.9(a).

We conclude that (1) the records of petitioner's airport interview and credible fear interview were sufficiently reliable to be considered by the agency when evaluating petitioner's credibility and (2) taking the records of these interviews into account, substantial evidence supports the agency's determination that petitioner did not testify credibly about the basis for her application for relief.

### I. Background

#### A.    Airport Interview (June 6, 2003)

On June 6, 2003, petitioner and her son were detained at John F. Kennedy Airport in New York while attempting to enter the country. Later that same day, petitioner was interviewed by an immigration inspector. Petitioner received the assistance of a Mandarin interpreter, through whom she conveyed that she understood that the purpose of this interview was to determine whether she should be temporarily admitted into the United States despite her apparent inadmissibility. In response to the inspector's question about whether she had "any fears or concerns about being removed from the United States or being sent back to [her] home country," petitioner stated: "I am afraid because I had by pass [*sic*] surgery on my heart and the government was forcing me not to have any more children. The government wanted me to go to a hospital and have a birth control device implant inside of me." She further stated that she had been kept "in detention for two days because [she] refused to have the birth control operation." In response to the inspector's question about whether she would be harmed if returned to her home country, petitioner stated: "If I am sent back I would die." Petitioner then affirmed that she had read the transcript of her statement (or had it read to her), that her answers were "true and correct to the best of [her] knowledge," and that "this statement [wa]s a full, true and correct record of [her] interrogation."

#### B.    "Credible Fear" Interview (June 12, 2003)

On June 12, 2003, an asylum officer conducted a "credible fear interview" with

3

petitioner at an Immigration and Naturalization Service ("INS") facility in Jamaica, New York, where petitioner had been detained since her airport interview. Petitioner was once more provided with a Mandarin interpreter. At the start of the interview, the asylum officer read petitioner the following statement:

> The purpose of this interview is to determine whether you may be eligible for asylum or protection from removal to a country where you fear persecution or torture. I am going to ask you questions about why you fear returning to your country . . . . It is very important that you tell the truth during the interview and that you respond to all of my questions. This may be your only opportunity to give such information. Please feel comfortable telling me why you fear harm. U.S. law has strict rules to prevent the disclosure of what you tell me today about the reasons why you fear harm. The information you tell me about the reasons for your fear will not be disclosed to your government, except in exceptional circumstances. The statements you make today may be used in deciding your claim and in any future immigration proceedings. It is important that we understand each other. If at any time I make a statement you do not understand, please stop me and tell me you do not understand so that I can explain it to you.

In response to the asylum officer's question about whether petitioner or any member of her family had "ever been mistreated or threatened by anyone in any country to which [she] may be returned," petitioner provided the following statement:

> After I had my son in 1990, I was forced to have an [intrauterine device ("IUD")] insertion by the Family Planning Officials (FPO). I attempted to remove it once to have more children in 1997 but was found to have had it removed and it was reinserted. In August 2002, I had to have surgery for my heart problems and the IUD was removed. The doctors said that I could not have the IUD inserted again because it will interfere with my heart problems. The FPO's [*sic*] came to re-insert the IUD in December 2002 but when my husband and I protested, they were going to arrest us, so we ran away and hid. If I have the IUD inserted again, I may die from complications from my heart medication and I will not be able to have more children.

In response to the inspector's question about whether she would be harmed if returned to her home country, petitioner stated: "The Family Planning Officials will arrest me and have another IUD inserted in me if I go back. If this happens, I may die from complications due to my heart condition." On the basis of petitioner's statements, petitioner was referred for a full hearing on her claims for asylum and withholding of removal. Pending a full hearing, petitioner was transferred to an INS "Minor and

Family Shelter"in Pennsylvania, which allowed her to be housed together with her minor son, and petitioner and her son were eventually released on parole from INS custody in September 2003.

**C. Asylum Application (November 12, 2003) and Merits Hearings (February 10, 2005 and June 8, 2005)**

On November 12, 2003, petitioner submitted a formal asylum application. In support of her application, petitioner submitted a sworn statement claiming (1) that she had experienced two forced abortions, one in September 1988 when she was one month pregnant and one in March 1989 when she was three weeks pregnant; (2) that, in July 1997, family planning officials forcibly entered her home and took her to the family planning office, where she was detained for three days and subjected to an IUD insertion; (3) that the July 1997 events motivated her to attempt suicide; and (4) that, in December 2002, her husband had physically assaulted family planning officials who arranged for her to have an IUD inserted against her wishes and, as a result, petitioner and her husband were forced to flee from their marital home to the home of petitioner's sister.

On February 10 and June 8, 2005, petitioner appeared before an IJ for hearings on her asylum application. At those hearings, petitioner testified that family planning officials had arranged for the termination of her first two pregnancies without informing her how far advanced these pregnancies were. With regard to her reasons for not wanting to use an IUD after her heart surgery, she stated that the doctor who had performed the surgery had recommended that she not use an IUD after her surgery because of the medication she would have to take. In describing her husband's December 2002 encounter with local family planning officials, she stated that her husband had fled to his uncle's home after the incident, whereas she had gone to her sister's home.

Both the IJ and the government asked petitioner to explain several discrepancies in her testimony and submissions. The IJ asked why, if petitioner had not been told at what stage her two pregnancies had been aborted, she was able to provide this information in her asylum application. Petitioner, in response, reiterated that she did not know how advanced her pregnancies were and

5

asserted, without explanation, that the statement in her asylum application had not been a lie. When the IJ asked this question again at the second hearing, petitioner claimed that she had prepared the asylum application while in detention.

Petitioner also testified that family planning officials had followed her husband home after his encounter with them in December 2002. When asked why she had not included this fact in her asylum application, she was unable to provide any explanation. The IJ also inquired why she had not discussed her two forced abortions or suicide attempt at the credible fear and airport interviews. Petitioner stated that she had not discussed the forced abortions because she was "confused" and did not know what to say. She stated that she had mentioned "suicide" at her airport interview when answering a question about what would happen if she were "sent back." However, she could not recall whether she had mentioned that she had "attempted suicide in the past." Finally, the IJ asked why the records from petitioner's heart surgery did not mention petitioner's IUD, "any problem that it might cause, or . . . that it had to be removed" prior to her operation. In response, petitioner stated that the doctor had "refused to make this kind of statement." Petitioner's counsel acknowledged that, in responding to the government's questions, petitioner had conceded that she lied about having an IUD removed because she wanted to have more children.

**D.      Decision of the Immigration Judge (June 29, 2005)**

Three weeks after the end of the merits hearing, on June 29, 2005, the IJ issued a written decision denying petitioner's applications for relief on the grounds that petitioner had failed adequately to establish "that she was subjected to forcible abortions, that she attempted suicide because she was forced to have an IUD inserted, or that she had developed very serious medical problems as a result of IUD insertions." Although the IJ declined to find petitioner "completely lack[ing] [in] credibility," he stated that he had "very serious doubts regarding [the] testimony" that petitioner had offered on these matters based on "discrepancies" between her testimony at the merits hearing and the statements that she had offered in other contexts. Specifically, the IJ noted that petitioner's written statements,

submitted in anticipation of the merits hearing, did not mention that family planning officials followed her husband home after the December 2002 incident; that the transcripts of petitioner's airport and credible fear interviews did not mention petitioner's forced abortions and suicide attempt; and, finally, that petitioner's hearing testimony did not reveal that petitioner had protested Chinese family planning policies herself—a claim she had made in her credible fear interview. The IJ also observed that (1) petitioner had been unable to support the questionable aspects of her claims with written documentation and (2) her explanations as to why she had been unable to do so were "unconvincing."

## E.     Board of Immigration Appeals Decision (December 27, 2006)

Petitioner appealed the IJ's decision to the BIA, contending, *inter alia*, that (1) the IJ's adverse credibility finding was not supported by substantial evidence and (2) the IJ was incorrect to rely on her airport and credible fear interviews in light of petitioner's asylum hearing testimony that she had been confused during those earlier interviews and her subsequent sworn statement that she had been "nervous and afraid" during the interviews. The BIA, in a decision issued on December 27, 2006, dismissed petitioner's appeal, agreeing with the IJ that petitioner had "failed to provide a reliable and coherent account of her claim for asylum" and, therefore, had failed to meet her burden of proof. The BIA concluded that the IJ had properly relied upon petitioner's failure to mention her two forced abortions and suicide attempt at the airport and credible fear interviews and, further, that the IJ had "properly found that, while [petitioner's] confusion and nervousness" during those interviews "was understandable, it did not excuse her failure to mention the entire crux of her claim." The BIA also determined that the IJ had properly taken account of petitioner's failure to "provide any objective documentary evidence to remedy the . . . discrepancies and omissions" in her submissions.

On appeal, petitioner now challenges, *inter alia*, the agency's adverse credibility finding as well as the agency's reliance on her airport and credible fear interviews.

## II. Discussion

### A. Reliance on the Record of Petitioner's Airport Interview

Petitioner contends that the agency erred in relying on the record of her airport interview when assessing her credibility. We disagree.

"[A]n IJ is not precluded from relying on an alien's testimony in an airport interview" as long as the record of that testimony "represents a sufficiently accurate record of the alien's statements to merit consideration in determining whether the alien is credible." *Guan v. Gonzales*, 432 F.3d 391, 396 (2d Cir. 2005) (internal quotation marks omitted). And, as we have previously held, the record of an airport interview is sufficiently accurate to merit consideration when it (1) provides a "'verbatim account or transcript'" of the alien's statements; (2) was conducted in a manner "'designed to elicit the details of an asylum claim'"; and (3) contains no indication that the alien was reluctant "'to reveal information'" or "'did not understand English or the translations provided by the interpreter.'" *Id.* (quoting *Ramsameachire v. Ashcroft*, 357 F.3d 169, 179-80 (2d Cir. 2004)). *But see Guan*, 432 F.3d at 396 ("[W]e do not regard these factors as essential to be assessed in every case, but simply as helpful matters to be considered where appropriate.").

In the instant case, petitioner was informed about the purpose of the airport interview and the importance of providing full and accurate testimony, asked about her ability to comprehend the questions posed to her, and given the opportunity to be interviewed in a private area. Furthermore, like the statements whose consideration we endorsed in *Ramsameachire* and *Guan,* the record of petitioner's airport interview "bears hallmarks of accuracy and reliability, as it is typewritten, signed by [petitioner], and initialed by [her] on each page." *Ramsameachire*, 357 F.3d at 181; *see also Guan*, 432 F.3d at 397 (noting that "(1) the INS officer read Guan a[ ] . . . statement concerning her rights under U.S. law and exhorting her to provide a full account of any persecution she may have suffered in China, (2) Guan was promptly provided with an interpreter and asked to confirm that she could understand the

8

proceedings, and (3) Guan signed and initialed the interview transcript after indicating that her answers were 'true and correct' and that her 'statement is a full, true, and correct record of [her] interrogation'").

Here, petitioner's airport interview was both (1) "conducted in a non-coercive and careful manner," *Ramsameachire*, 357 F.3d at 181, and (2) appropriately documented by the interviewing authorities, *id.*; *see also Guan*, 432 F.3d at 397. Accordingly, the record of that interview was sufficiently reliable to merit consideration. Petitioner's subsequent assertions that she was "nervous" and "afraid" during this interview do not alter our analysis, for reasons we set forth in *Ramsameachire* and *Guan*. *See Ramsameachire*, 357 F.3d at 181-82 ("[A]lthough Ramsameachire attempts to reconcile the differences between his airport statements and his later testimony by asserting that he was nervous about speaking to INS officials at the airport, the fact that he stated at the interview that he was comfortable speaking in a private room and that he understood the purpose of the interview undermines any claim that the interview was unduly coercive or that Ramsameachire felt that he had no opportunity to explain his situation to the officer."); *see also Guan*, 432 F.3d at 397 n.6 (approving of this observation and noting that, "while the IJ and BIA should not overlook complaints of coercion altogether, an alien's mere recitation that he was nervous or felt pressured during an airport interview will not automatically prevent the IJ or BIA from relying [on] statements in such interviews when making adverse credibility determinations" (citation omitted)).

## B. Reliance on the Record of Petitioner's Credible Fear Interview

Petitioner also contends that the agency erred in considering the statements that she made during her credible fear interview. Evaluating the merits of this challenge requires us to determine the circumstances under which an IJ and the BIA may consider the record of a credible fear interview when evaluating an alien's credibility.

In *Ramsameachire*, we stated that "the BIA . . . must closely examine each airport interview before concluding that it represents a sufficiently accurate record of the alien's statements," having

9

observed that "[t]he airport interview is an inherently limited forum for the alien to express the fear that will provide the basis for his or her asylum claim." 357 F.3d at 179. As we explained:

> The interview takes place immediately after an alien has arrived in the United States, often after weeks of travel, and may be perceived by the alien as coercive or threatening, depending on the alien's past experiences. Moreover, at the interview, the alien is not represented by counsel, and may be completely unfamiliar with United States immigration laws and the elements necessary to demonstrate eligibility for asylum. Finally, because those most in need of asylum may be the most wary of governmental authorities, the BIA and reviewing court must recognize, in evaluating the statements made in an interview, that an alien may not be entirely forthcoming in the initial interview.

*Id.* We thereafter provided a non-exhaustive list of factors that the BIA should use to evaluate whether an airport interview can be considered reliable. *Id.* at 179-80 (relying on *Balasubramanrim v. INS*, 143 F.3d 157 (3d Cir. 1998) and *Senathirajah v. INS*, 157 F.3d 210 (3d Cir. 1998)). We further explained that the BIA, upon determining that an airport interview is sufficiently reliable, should accord weight to any discrepancies between the airport interview and later statements "in light of the relatively superficial nature of the airport interview." *Id.* at 180.

Where, however, the concerns identified in *Ramsameachire* do not apply to the same degree, we have recognized that the BIA and reviewing courts need not engage in "special scrutiny" of an interview record. *See Diallo v. Gonzales*, 445 F.3d 624, 632 (2d Cir. 2006) ("[I]n light of the differences between asylum interview[s] and airport interviews, . . . asylum interview[s] . . . do not call for *special* scrutiny, as airport interviews do."). For example, in *Diallo*, we noted that, in contrast with airport interviews, asylum interviews "take place after the alien has arrived in the United States, has taken the time to submit a formal asylum application, and has had the opportunity to gather his or her thoughts, to prepare for the interview, and to obtain counsel." *Id.* On that basis, we concluded that "the imperative to 'closely examine' the reliability of asylum interviews is not as pressing as it is in the airport interview context." *Id.* (quoting *Ramsameachire*, 357 F.3d at 179). We further explained:

> This is not to say, of course, that the BIA and reviewing courts are not required carefully to consider the reliability of asylum interviews. Of course they are. As with other materials in the asylum record, factfinders should accord to them the weight

10

that they merit in light of the record as a whole, and we should review the resulting factual determinations for substantial evidence.

*Id.*

Credible fear interviews occur after an alien has, at an airport interview, "indicate[d] an intention to apply for asylum, or expresse[d] a fear of persecution or torture, or a fear of return to his or her country." 8 C.F.R. § 235.3(b)(4). Federal regulations require that all applicants who are referred from an airport interview to a credible fear interview be provided with a Form M-444, titled "Information About Credible Fear Interview." *Id.* § 235.3(b)(4)(i). This form describes:

(A)     The purpose of the referral and description of the credible fear interview process;

(B)     The right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government;

(C)     The right to request a review by an immigration judge of the asylum officer's credible fear determination; and

(D)     The consequences of failure to establish a credible fear of persecution or torture.

*Id.* The right to consultation described in Form M-444 is explicitly recognized in a related regulation, which provides that an "alien may consult with a person or persons of the alien's choosing prior to the [credible fear] interview or any review thereof" and that "[a]ny person or persons with whom the alien chooses to consult may be present at the [credible fear] interview and may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview." *Id.* § 208.30(d)(4). Finally, like petitioner in this case, an alien is ordinarily detained during the interval between the airport interview and the credible fear interview. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV); 8 C.F.R. § 235.3(b)(4)(ii).

Based on the foregoing, a credible fear interview appears to fall somewhere on the spectrum of reliability between an airport interview and an asylum interview when one considers its relative formality, its potential to be perceived as coercive, and its ability to elicit all of the details supporting an asylum claim. On the one hand, unlike an airport interview, a credible fear interview occurs several

11

days after an alien arrives in the United States and after he or she has had the opportunity "to consult with a person or persons of the alien's choosing." *See* 8 C.F.R. § 208.30(d)(4); *Ramsameachire*, 357 F.3d at 179 (noting that airport interviews occur "immediately after an alien has arrived in the United States" and that the alien is not represented by counsel). Furthermore, an alien is notified prior to the interview that "[i]t is very important that you tell the officer all the reasons why you have concerns about being removed." J.A. 657 (Form M-444, Information About Credible Fear Interview).

On the other hand, an alien appearing at a credible fear interview has ordinarily been detained since his or her arrival in the United States and is therefore likely to be more unprepared, more vulnerable, and more wary of government officials than an asylum applicant who appears for an interview before immigration authorities well after arrival. *See* 8 U.S.C. § 1158(a)(2)(B) (requiring application for asylum within one year of arrival in the United States); *Diallo*, 445 F.3d at 632 (noting that asylum interviews "take place after the alien has arrived in the United States, has taken the time to submit a formal asylum application, and has had the opportunity to gather his or her thoughts[ and] to prepare for the interview"). Moreover, although credible fear interviewees are asked to provide all of the *reasons* for their concern about being removed, they are not required to give a "detailed and specific account" of the bases for their claims, as applicants for asylum must in their asylum application. *See* Form I-589, Application for Asylum and for Withholding of Removal 5, http://www.uscis.gov/files/ form/I-589.pdf (last visited Oct. 14, 2009) (requesting "specific dates, places, and descriptions about each event or action described" and "documents evidencing . . . the specific facts on which you are relying to support your claim").

We conclude that credible fear interviews are more similar to airport interviews than asylum interviews and therefore warrant the close examination called for by *Ramsameachire*. Importantly, credible fear interviews, like airport interviews, are part of what can be characterized as a *defensive* path to asylum, which must be pursued by aliens detained at the border, in contrast to an *affirmative* path by which an alien already present in the United States submits an application for asylum. Furthermore,

credible fear interviews are not designed to elicit all the details of an alien's claim, but rather only to determine whether there is "a significant possibility . . . that the alien could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v).[3]  Consequently, it is not surprising that, in some cases, insignificant details about an applicant's claim might not be mentioned during a credible fear interview, only to be later elicited in an asylum interview.  *Cf. Ramsameachire*, 357 F.3d at 180 (noting, with respect to airport interviews, that "[i]t may often be the case that an alien's answers . . . provide a less detailed account of the alien's experiences than his or her subsequent asylum application and testimony").  Because one would expect the information provided during a credible fear interview to vary from information elicited at later stages of the asylum process, adverse credibility determinations based on "discrepancies" with a credible fear interview should be examined with care to ensure that they are not arbitrary.  *See id.* at 180-81 ("[T]he nature of the inconsistencies themselves will decide whether the alien's . . . statements render his or her subsequent testimony incredible.").

In reviewing an adverse credibility determination, however, the BIA need not engage in "robotic incantations" or make any talismanic references to "close examination" or "special scrutiny." *Cf. Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 336-37 n.17 (2d Cir. 2006) (explaining that an IJ need not engage in "robotic incantations" to demonstrate that he or she has considered and rejected petitioner's evidence).  Where the record of a credible fear interview displays the hallmarks of reliability, it appropriately can be considered in assessing an alien's credibility.  *See Ramsameachire*, 357 F.3d at 180.

Here, petitioner's credible fear interview, like her airport interview, bears sufficient indicia of reliability to warrant its consideration by the agency.  Although it is unclear whether the credible fear

---

[3] Indeed, the training given to asylum officers conducting credible fear interviews counsels against conducting a searching inquiry into the details of an alien's claim.  Officers are instructed to apply "a low-threshold test designed to screen all persons who could qualify for asylum into the hearing process."  INS, *Asylum Officer Basic Training: Credible Fear*, 2001 WL 36205685, at Pt. V (Nov. 30, 2001).  Accordingly, asylum officers conducting credible fear interviews are directed to "draw all reasonable inferences in favor of the applicant . . . [and] accord the 'benefit of the doubt' to the applicant." *Id.*  There is no instruction to search into potentially relevant details; to the contrary, asylum officers are instructed to seek "a substantial reduction of time" spent on credible fear interviews, so as to "significantly improve program efficiency."  Memorandum from Joseph E. Langlois, Acting Dir. of Int'l Affairs, to Asylum Office Directors, Deputy Directors, Supervisory Asylum Officers, and Asylum Officers, 2000 WL 33596820 (Dec. 8, 2000).

interview report purports to be a "verbatim account" of the interview, the proceeding was memorialized in a typewritten document setting forth the questions put to petitioner as well as her responses. *See id.*; *cf. In re S-S-*, 21 I. & N. Dec. 121, 123-24 (B.I.A. 1995) ("When . . . the applicant's credibility is placed in issue because of alleged statements made at the asylum interview, our review requires a reliable record of what transpired at that interview. This record might be preserved in a hand-written account of the specific questions asked of the applicant and his specific responses to those questions."). The record further reflects that the interview was conducted with the aid of a Mandarin interpreter and petitioner does not contend that she did not understand the questions presented. *See Ramsameachire*, 357 F.3d at 181. The credible fear interview report makes clear that, before asking petitioner any questions, the interviewing officer explained the purpose of the interview, the importance of providing full and accurate testimony, and the fact that petitioner could ask for clarification at any point during the proceedings. Finally, petitioner was asked questions that were "clearly designed to elicit a potential basis for an asylum claim," *id.*, such as whether she or her family had ever been mistreated or threatened in the past and whether she feared she would be harmed upon return to China.

We again reject the notion that a petitioner's claim that she was nervous and distracted during the credible fear interview automatically undermines or negates its reliability as a source of her statements. *See id.* at 181-82; *see also Guan*, 432 F.3d at 397 n.6. Petitioner's credible fear interview, like her airport interview, was both (1) "conducted in a non-coercive and careful manner," *Ramsameachire*, 357 F.3d at 181, and (2) appropriately documented by the interviewing authorities, *id.*; *see also Guan*, 432 F.3d at 397. Accordingly, the record of that interview was sufficiently reliable to merit consideration.

## C. The Adverse Credibility Determination

The IJ's conclusion that petitioner had failed to meet her burden of proof was based primarily on his finding that petitioner had not testified credibly about her forced abortions and suicide attempt. That finding, in turn, rested largely on the finding that petitioner had not mentioned these events

14

during her airport and credible fear interviews. We review the agency's factual findings, including adverse credibility determinations, under the substantial evidence standard, treating them as "conclusive unless *any* reasonable adjudicator would be *compelled* to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B) (emphases added).

"[O]missions that go to a heart of an applicant's claim can form the basis for an adverse credibility determination." *Cheng Tong Wang v. Gonzales*, 449 F.3d 451, 453 (2d Cir. 2006). Petitioner's asylum application emphasized that she had undergone two forced abortions and had been driven to attempt suicide. J.A. 396, 398. Petitioner did not, however, discuss any of these events at her airport interview, J.A. 565-69, or at her later credible fear interview, J.A. 559-63. Such inconsistencies go well beyond the "insignificant and trivial" variations that might ordinarily be expected in light of the limited purpose of both airport and credible fear interviews. *See Latifi v. Gonzales*, 430 F.3d 103, 105 (2d Cir. 2005) (rejecting an adverse credibility determination based on "insignificant and trivial" inconsistencies). Because these omissions undeniably go to the heart of petitioner's claims for asylum and withholding of removal, it was not unreasonable for the agency to draw an adverse inference about petitioner's credibility based, *inter alia*, on her failure to mention the forced abortions and suicide attempt at her airport interview or her credible fear interview. It was also not unreasonable for the IJ and the BIA to conclude that petitioner—having failed to establish the veracity of the claims on which she based her application for relief—had not demonstrated her eligibility for asylum, withholding of removal, or relief under the Convention Against Torture.

### III. Conclusion

In sum, we hold that credible fear interviews, like airport interviews, merit careful examination to ensure their reliability. Where, as here, however, the record of a credible fear interview bears sufficient indicia of reliability, it may be relied on as a source of an alien's statements. Moreover, where examination of the credible fear interview reveals inconsistencies that go to the heart of an alien's claims, as it does in this case, an adverse credibility determination based on those inconsistencies can

15

withstand substantial evidence review.  For the reasons set forth above, the petition for review is

**DENIED**.