*Jian Liang v. Garland*

# United States Court of Appeals
# For the Second Circuit

August Term 2020

Argued:  November 20, 2020
Decided:  August 19, 2021

No. 18-2257

JIAN LIANG, AKA JIAN HUI LIANG,

*Petitioner*,

*v.*

MERRICK B. GARLAND, UNITED STATES
ATTORNEY GENERAL,

*Respondent.*[*]

Petition from the Board of Immigration
Appeals, No. A202-152-185

Before:      LIVINGSTON, *Chief Judge*, KEARSE, and SULLIVAN, *Circuit Judges*.

Petitioner, a Chinese national who alleges that the Chinese government placed him on a national "blacklist" because of his Christian faith, challenges the denial of his application for asylum, withholding of removal, and relief under the

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Merrick B. Garland is automatically substituted for former Attorney General William P. Barr.

Convention Against Torture following a determination by an immigration judge that he was not credible. Although Petitioner testified about the blacklist on direct examination at his asylum hearing, he did not explain how he knew that he was on that list. It was not until cross-examination that he stated, for the first time, that the Chinese police had divulged this information to his father in October 2014. Problematically, however, the letter submitted by Petitioner's father to the agency did not mention a meeting with police officers in October 2014, let alone that the officers disclosed Petitioner's inclusion on a national blacklist. As a result, the IJ concluded that Petitioner was attempting to bolster his application through false testimony and determined that Petitioner was not credible. The Bureau of Immigration Appeals affirmed.

While a factual omission is ordinarily less probative of credibility than an inconsistency, the omission here concerned material information that Petitioner would be expected to have divulged earlier in the process. Petitioner's alleged inclusion on this blacklist was the difference between him being the victim of a discrete instance of harassment at the hands of local police on the one hand and the target of a coordinated campaign by national officials to persecute Petitioner because of his religion on the other. How Petitioner knew that he was on that list, then, was critical to his application. As Petitioner failed to raise these facts earlier, and given that Petitioner's father also omitted this information from his letter, we conclude that there was substantial evidence supporting the agency's adverse credibility determination and deny the petition.

DENIED.

Richard Tarzia, Law Office of Richard Tarzia, Belle Mead, NJ, *for Petitioner*.

Nancy N. Safavi, Trial Attorney, Office of Immigration Litigation, Ernesto H. Molina, Jr., Deputy Director, *for* Brian Boynton, Acting Assistant Attorney General, Civil Division, United States Department of Justice, Washington, DC., *for Respondent*.

RICHARD J. SULLIVAN, *Circuit Judge*:

In *Hong Fei Gao v. Sessions*, we explained that in asylum cases, "in general[,] omissions are less probative of credibility than inconsistencies created by direct contradictions in evidence and testimony."  891 F.3d 67, 78 (2d Cir. 2018) (internal quotation marks omitted).  We did not mean to suggest, of course, that an omission can never undermine an asylum applicant's credibility.  Far from it.  For instance, an omission is particularly probative of a lack of credibility when it concerns information that the applicant would be expected to have disclosed earlier.  This case presents an example of such an omission.  Accordingly, we conclude that substantial evidence supports the agency's adverse credibility determination and deny the petition.

## I.    Background

Jian Liang, a native and citizen of the People's Republic of China, illegally entered the United States in early January 2015 and was promptly detained.  Later that month, Liang met with a Department of Homeland Security asylum officer for a "credible fear" interview.[1]  During that interview, Liang claimed that he was

---

[1] Credible fear interviews are held after an alien has "indicated an intention to apply for asylum, or expressed a fear of persecution or torture, or a fear of return to his or her country."  *Ming Zhang v. Holder*, 585 F.3d 715, 723 (2d Cir. 2009) (internal quotation marks and brackets omitted).  The

afraid to return to China because he believed that the Chinese government would persecute him on account of his Christian faith. Liang explained that he had previously been arrested for practicing Christianity and indicated that his name was on a government-maintained "black list," meaning that the Chinese government would track him down if he were returned to the country. Certified Admin. Record ("CAR") at 485. In light of those statements, the asylum officer concluded that there was a possibility that Liang could establish that he was eligible for asylum or withholding of removal.

The following month, in February 2015, the Department of Homeland Security initiated removal proceedings against Liang under 8 U.S.C. § 1182(a)(6)(A)(i). Thereafter, Liang submitted an I-589 application, formally requesting asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").[2] As in his credible fear interview, Liang maintained that he had been persecuted by the Chinese government on account of his Christian

purpose of those interviews is "to determine whether there is a 'significant possibility . . . that the alien could establish eligibility for asylum.'" *Id.* at 724 (quoting 8 U.S.C. § 1225(b)(1)(B)(v)).

[2] An I-589 application is the form that an alien must fill out to indicate that he is seeking asylum or withholding of removal. *See* U.S. Citizenship & Immigr. Servs. & U.S. Exec. Off. for Immigr. Rev., I-589, Application for Asylum and for Withholding of Removal: Instructions at 1, OMB No. 1615-0067 (2020). The application can also be used to apply for protection under the CAT. *See id.* Applicants are encouraged to attach a written statement to that form to support their claim. *See id.* at 5.

4

faith and that he feared being removed to China because he believed that this persecution would resume.

In a written statement attached to his I-589 application, Liang stated he was introduced to Christianity by a friend in 2014 and then began to regularly attend services at an underground church. He claimed that he was handing out fliers for the church in early September 2014 when a group of police officers arrested him, detained him for ten days, and inflicted multiple beatings. Following his release, Liang immediately resumed attending church meetings. A little over a week later, the police raided one of these meetings, causing Liang to flee and go into hiding. While Liang was in hiding, the police went to Liang's family's home to look for him and destroyed his family's furniture. Liang asserted that he left China about three months later and made his way into the United States through Mexico. Liang made no mention, however, of being on a government-run blacklist in this I-589 statement.

Over the next few months, several of Liang's friends and family members submitted letters on his behalf, urging that Liang be granted asylum or some other similar form of relief. Most notably, Liang's father filed a letter corroborating Liang's claim that the police searched their family home in September 2014. This

5

letter mentioned no other interaction with the police, nor did it say anything about Liang being on a national blacklist.

Eventually, Liang appeared before an immigration judge ("IJ") in August 2017 for an asylum hearing.[3] On direct examination, he reiterated many of the same points from his prior statements. Specifically, he described his treatment at the hands of local police and testified about the police's search of his family's home in September 2014. Liang closed his direct testimony by explaining that he believed that the Chinese government would detain him if he were returned to China because his name is on a blacklist that is associated with his "national ID card." CAR at 86.

It was not until cross-examination, however, that Liang finally explained how he knew that he was on this supposed blacklist. Specifically, Liang claimed that the police visited his parents' house a second time in October 2014 (which was itself a new revelation), and it was during this search that the police told his father that Liang was on a blacklist:

> [Q:] Why do you think the local police in the Fujian Province would be interested in you practicing in your faith in a different province in China?
>
> [A:] Only police, police in everywhere in China will

---

[3] Liang had already conceded removability in December 2016.

arrest underground church.

[Q:] How do you know that?

[A:] Because there's identification – there's ID number in our identification card and we are on this blacklist and police anywhere, everywhere, will arrest us.

[Q:] How did you know that you're on a blacklist?

[A:] Because police mentioned that.

[Q:] When did they mention that?

[A:] They – when they went to my home in October of 2014, when they asked my father about me, they mentioned this.

CAR at 99.

The government immediately inquired as to why this information had not been disclosed either in Liang's I-589 statement or in his father's letter. Liang's only explanation was that neither he nor his father knew that their statements "ha[d] to be that detailed." CAR at 99–100.

Following the government's cross-examination, Liang doubled down in response to the IJ's questions, and stated (also for the first time) that not only did his father know he was on a blacklist, but so did one of his friends from the underground church in China:

[IJ:] Sir, did your friend, Xiao[,] Chuan Hui, . . . was he also blacklisted?

[A:] Yes.

7

> [IJ:]  How come he didn't write that in his letter?
>
> [A:]  For him, I looked at his letter, he did not write that specific.
>
> [IJ:]  Did he know that you were blacklisted?
>
> [A:]  He knows.
>
> [IJ:]  Why didn't he put that in his letter that you were blacklisted?
>
> [A:]  Because I told him, so perhaps when he write his letter, he's not that detailed.

CAR at 100–01.  But, as the IJ's questioning indicated, the letter Liang's friend submitted made no mention of either Liang or himself appearing on a "blacklist." *See* CAR at 307–08.

At the conclusion of the proceeding, the IJ denied Liang's application for asylum, withholding of removal, and CAT relief.  *See In re Jian Liang*, No. A 202 152 185 (Immigr. Ct. N.Y.C. Aug. 15, 2017).  The IJ explained that Liang's new and uncorroborated testimony on cross-examination rendered him not credible.  In so finding, the IJ noted that Liang's explanations for these omissions were not sufficient.  Finally, the IJ concluded that, even assuming that Liang was credible as to his continued practice of Christianity in the United States, he had no objectively reasonable fear of future persecution if removed because he failed to establish that Chinese officials were aware of his religious practices or that there was a pattern or practice of persecution of Christians in Liang's home province of

8

Fujian. The IJ consulted both a state department report and country-conditions evidence put forward by Liang and found that none of those materials mentioned Fujian Province as an area of particular note or concern with respect to the persecution of Christians.

Liang appealed that decision to the Board of Immigration Appeals (the "BIA"). Liang focused his arguments on asylum and withholding of removal, and did not challenge the IJ's finding that he was ineligible for CAT relief. In July 2018, the BIA dismissed Liang's appeal, finding no clear error in the IJ's adverse credibility determination, and agreeing with the IJ's finding that Liang had demonstrated no objectively reasonable fear of future persecution following removal. *See In re Jian Liang*, No. A 202 152 185 (B.I.A. July 11, 2018). Liang timely petitioned for review.

## II. Standard of Review

We examine the decisions of both the BIA and the IJ together, including the portions of the IJ's decision that the BIA did not expressly mention, so long as they were not rejected by the BIA. *See Hong Fei Gao*, 891 F.3d at 76 (citing *Xiu Xia Lin v. Mukasey*, 534 F.3d 162, 166 (2d Cir. 2008)). In doing so, we review questions of law and the application of law to undisputed facts *de novo*. *See Yanqin Weng v. Holder*,

9

562 F.3d 510, 513 (2d Cir. 2009). Our review of the agency's factual findings, however, is more deferential.

"[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary[.]" 8 U.S.C. § 1252(b)(4)(B). We are therefore required to uphold the agency's factual determinations so long as "they are supported by reasonable, substantial[,] and probative evidence in the record." *Yanqin Weng*, 562 F.3d at 513 (internal quotation marks omitted); *see also Gurung v. Barr*, 929 F.3d 56, 60 (2d Cir. 2019). This "substantial evidence" standard is even more deferential to the fact finder than "clear error" review. *See Wu Lin v. Lynch*, 813 F.3d 122, 127 (2d Cir. 2016). *See also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir. 1994) ("We will reverse BIA findings of fact only if 'a reasonable fact-finder would have to conclude' otherwise." (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 482 (1992))).

While all of the agency's factual findings are subject to this substantial evidence standard, we afford particular deference to the agency "[w]hen evaluating credibility determinations for substantial evidence," *Xiu Xia Lin*, 534 F.3d at 165–66, and will deviate from an adverse credibility determination only if, "from the totality of the circumstances, it is plain that no reasonable fact-finder

could make such an adverse credibility ruling," *Hong Fei Gao*, 891 F.3d at 76 (quoting *Xiu Xia Lin*, 534 F.3d at 167). In making that assessment, we ask "whether the agency has provided 'specific, cogent reasons for the adverse credibility finding and whether those reasons bear a legitimate nexus to the finding.'" *Hong Fei Gao*, 891 F.3d at 77 (quoting *Xiu Xia Lin*, 534 F.3d at 167).

### III.  Statutory and Regulatory Framework

Liang pursues asylum and withholding of removal, tied to his assertion that, if removed to China, the Chinese government will harm him because of his Christian faith.

Asylum is a form of relief that turns on evidence of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[4] *Hong Fei Gao*, 891 F.3d at 75 (quoting 8 U.S.C. § 1101(a)(42)(A)); *see also Kone v. Holder*, 596 F.3d 141, 146 (2d Cir. 2010). Withholding of removal similarly turns on whether a petitioner can "demonstrate a clear probability of future persecution on account of" one of these protected characteristics. *Hong Fei Gao*, 891 F.3d at 76 (internal quotation marks

---

[4] Relief will not be denied simply because there is "more than one motive for mistreatment, as long as at least one central reason for the mistreatment is on account of a protected ground." *Acharya v. Holder*, 761 F.3d 289, 297 (2d Cir. 2014) (internal quotation marks omitted).

omitted); *see also Ivanishvili v. U.S. Dep't of Justice*, 433 F.3d 332, 339 (2d Cir. 2006). Persecution in this context means the "the infliction of suffering or harm upon those who differ on the basis of a protected statutory ground." *Ivanishvili*, 433 F.3d at 341.

There are, of course, a few differences between asylum and withholding of removal. For instance, while withholding of removal is automatically granted to all eligible applicants, the choice of whether to grant asylum is ultimately left to the discretion of the Attorney General. *See Kone*, 596 F.3d at 146–47 (drawing the distinction between the mandatory nature of withholding of removal and the discretionary nature of asylum). But the primary distinction between the two lies in what an applicant must show to demonstrate eligibility.

Asylum requires an applicant to prove either that he was previously persecuted on account of a protected characteristic, or that he has a well-founded fear of such persecution in the future if removed. Past persecution alone is usually not enough to warrant asylum, meaning that relief is ordinarily reserved for those who can demonstrate a subjective fear of future persecution that is objectively

12

reasonable.[5] *See id.* at 146. But when an alien has already endured persecution once, a well-founded fear of future persecution is presumed, and it becomes the government's burden to rebut that presumption. *See id.* at 147; *Paul v. Gonzales*, 444 F.3d 148, 154 (2d Cir. 2006); *but see* 8 C.F.R. § 1208.13(b)(1) (noting that this presumption does not apply where "the applicant's fear of future persecution is unrelated to the past persecution"). The government may do so by showing, by a preponderance of the evidence, that circumstances have changed in the country of removal or that the applicant can avoid persecution by relocating to a different area of the country. *See Kone*, 596 F.3d at 147.

Eligibility for withholding of removal differs in two key respects. First, and most importantly, withholding of removal "requires the applicant to clear a higher bar." *Delgado v. Mukasey*, 508 F.3d 702, 705 (2d Cir. 2007); *see also Wei Sun v. Sessions*, 883 F.3d 23, 28 (2d Cir. 2018). While asylum can be granted "even where the probability of the feared harm is less than 50 [percent]," *Huo Qiang Chen v. Holder*, 773 F.3d 396, 404 (2d Cir. 2014), withholding of removal is reserved for applicants who "demonstrate a clear probability of future persecution," *Hong Fei*

---

[5] The exception to this statement is known as "humanitarian asylum," and it is available only to applicants "whose persecution was particularly severe or who may suffer 'other serious harm' if removed." *Kone*, 596 F.3d at 146 (quoting 8 C.F.R. § 1208.13(b)(1)(iii)); *see also Jalloh v. Gonzalez*, 498 F.3d 148, 151 (2d Cir. 2007).

*Gao*, 891 F.3d at 76 (internal quotation marks omitted), which requires a "more likely than not" showing, *Delgado*, 508 F.3d at 705–06. Second, withholding of removal cannot be granted based on past persecution alone. *See Paul*, 444 F.3d at 155. But, as in the asylum context, past persecution creates a presumption of future persecution, shifting the burden of proof to the government. *See* 8 C.F.R. § 1208.16(b)(1)(i); *see also Kone*, 596 F.3d at 147.

## IV. Discussion

Liang argues that we should presume that he will be persecuted if removed to China because his testimony was credible and demonstrated a history of past persecution on account of his religion. Separately, Liang asserts that even absent a history of persecution, the facts in the record clearly demonstrate that he has a well-founded fear of future persecution. We address each argument in turn.

## A. Adverse Credibility Determination

An applicant can generally prove that he is eligible for any of asylum, withholding of removal, or CAT relief based on nothing more than his own testimony, so long as that testimony is credible.[6] *See Urgen v. Holder*, 768 F.3d 269,

---

[6] In certain circumstances, however, corroborating evidence might be needed. *See Wei Sun*, 883 F.3d at 28. For instance, an applicant's "testimony may not be sufficient to carry the burden of persuading the fact finder of the accuracy of his claim of crucial facts if he fails to put forth

14

273 (2d Cir. 2014) (asylum); *Chuilu Liu v. Holder*, 575 F.3d 193, 196 (2d Cir. 2009) (withholding of removal); 8 C.F.R. § 208.16(c)(2) (CAT). But "[t]here is no presumption of credibility." *Wei Sun*, 883 F.3d at 28; *see also Likai Gao v. Barr*, 968 F.3d 137, 144 (2d Cir. 2020). So, to assess an applicant's reliability, "the IJ considers the totality of the circumstances, including the demeanor, candor, or responsiveness of the applicant, the inherent plausibility of the applicant's account, the consistency between statements and the internal consistency of each such statement, and any inaccuracies or falsehoods in such statements." *Wei Sun*, 883 F.3d at 28 (internal quotation marks and alterations omitted); *see also* 8 U.S.C. § 1158(b)(1)(B)(iii).

Historically, to make an adverse credibility determination based on inconsistencies in an applicant's testimony, we required the IJ to both "demonstrate a nexus between [the] inconsistencies . . . and the applicant's claims" and "establish that the inconsistencies were material to the applicant's claims for [relief]." *Xiu Xia Lin*, 534 F.3d at 165. But that changed in 2005 with the passage of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 (2005). "The REAL

---

corroboration that should be readily available." *Id.* "Where . . . the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence." *Id.* (internal quotation marks omitted).

15

ID Act freed . . . IJ[s] from the nexus and materiality requirements by explicitly stating that an IJ may base an adverse credibility determination on any inconsistencies, 'inaccuracies[,] or falsehoods . . . without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.'" *Xiu Xia Lin*, 534 F.3d at 165 (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)) (emphasis omitted).[7] Under this new standard, an IJ is simply required to "evaluate inconsistencies in light of the totality of the circumstances." *Id.* (internal quotation marks omitted).

Over the years, we have provided guidance on the outer boundaries of an IJ's expanded ability to make an adverse credibility determination. Although "IJ[s] may rely on *any* inconsistency or omission in making an adverse credibility determination[,]" even those that are "collateral or ancillary to an applicant's claims[,]" *id.* at 167 (internal quotation marks omitted), we have cautioned that "omissions are less probative of credibility than inconsistencies created by direct contradictions in evidence and testimony," *Gurung*, 929 F.3d at 61 n.1 (quoting *Hong Fei Gao*, 891 F.3d at 78). Consequently, in *Hong Fei Gao*, we announced three

---

[7] Although *Xiu Xia Lin* dealt specifically to the REAL ID Act's changes to the asylum statute, *see* 534 F.3d at 165, the REAL ID Act made an identical modification to the credibility standard for withholding of removal proceedings. *See* Pub. L. No. 109-13, 119 Stat. 231 (modifying Section 241(b)(3) of the Immigration and Nationality Act).

overarching limits on an IJ's ability to base an adverse credibility determination on an omission alone.

First, "[a] trivial . . . omission that has no tendency to suggest a petitioner fabricated his or her claim will not support an adverse credibility determination." *Hong Fei Gao*, 891 F.3d at 77. Second, and relatedly, the IJ must "evaluate each . . . omission in light of the totality of the circumstances, and all relevant factors." *Id.* at 79 (internal quotation marks omitted). Among other things, this means evaluating an applicant's explanation for the omission in question. *Id.* And third, in assessing the materiality of a particular omission, the IJ must remain mindful that petitioners "are not required to list every incident of persecution on their I-589 statement." *Id.* at 78 (internal quotation marks omitted). Thus, the IJ should consider "whether th[e] [omitted] facts are ones that a credible petitioner would reasonably have been expected to disclose under the relevant circumstances." *Id.* at 79.

Based on these considerations, we conclude that the agency's adverse credibility determination is supported by substantial evidence. To explain why we reach this conclusion, it is critical to understand the precise omission at issue.

The omission was not that Liang failed to mention that he was on a blacklist

17

maintained by the Chinese government. Indeed, while Liang did not include that fact in his I-589 statement, he raised it in both his direct testimony before the IJ and at his credible fear interview back in January 2015.[8]

Instead, the omission is that, up until cross-examination, Liang supplied no testimony or other evidence suggesting that Chinese police officers had returned to his family's home in October 2014 to conduct another search, at which time the officers volunteered to Liang's father that Liang was on a "blacklist." Liang then followed up these assertions by stating, again for the first time, that his church friend was also on the blacklist and knew that Liang was on the blacklist as well. These belated disclosures present a few interrelated problems that, in light of the totality of the circumstances, support the IJ's adverse credibility determination.

To start, Liang's testimony is unsupported by the other record evidence. Not only does his father's letter not mention discussing a blacklist with the police, but Liang's father omitted altogether the fact that the police searched his house in October 2014. Indeed, until cross-examination, both Liang's testimony and the

---

[8] That said, Liang's failure to make this point in his I-589 statement, though certainly not dispositive as to his credibility, *Pavlova v. INS*, 441 F.3d 82, 90 (2d Cir. 2006) (cautioning that "asylum applicants are not required to list every incident of persecution on their I-589 statements"), is relevant to it, *see Xian Tuan Ye v. Dep't of Homeland Sec.*, 446 F.3d 289, 295–96 (2d Cir. 2006).

18

documentary evidence indicated that the police had searched his family's home only once, in September 2014. Similarly, although Liang testified that his church friend knew about the blacklist, his friend's letter made no mention of that fact.

While Liang suggests that this new information was immaterial because the agency could have inferred that he was on some sort of official list from the fact that the police knew to look for him at his family's home, we disagree. There are any number of explanations for how local police officers could have come to learn of Liang's address, and it is by no means obvious, much less to be presumed, that Liang's experience was part of some broader plan by the Chinese government to track and persecute Liang.

This mismatch between Liang's late-breaking testimony and the documentary evidence is particularly troubling because the omission does not concern some minor or extraneous detail. Rather, Liang omitted critical information that he would reasonably have been expected to disclose much earlier. The fact that the police made a *second* visit to his family's home in October 2014 is a telling omission. *See Gui Guo Lin v. Sessions*, 729 F. App'x 78, 80 (2d Cir. 2018); *Changwen Lin v. Sessions*, 687 F. App'x 109, 111 (2d Cir. 2017). But more importantly, Liang made abundantly clear that he was afraid of future persecution

19

because his inclusion on the blacklist meant that the Chinese government would be able to track him anywhere in the country. *See, e.g.*, CAR at 86 (indicating that the blacklist is tied to his "national ID card"). In other words, the blacklist is the difference between this being a discrete incident at the hands of local police officers and a coordinated campaign by national officials. If nothing else, the blacklist was centrally important to the issue of whether Liang could avoid persecution by relocating to a different area of China following removal. Liang's presence on the blacklist, then, is central to his petition and, accordingly, one would expect that he would have disclosed earlier the fact that the police visited his family's house for a second time asking for him and mentioning his presence on such a list. *See Xu Duan Dong v. Ashcroft*, 406 F.3d 110, 112 (2d Cir. 2005) (concluding that the applicant's significant delay in raising facts material to his claim "strain[ed] credulity" (internal quotation marks and alterations omitted)). Liang's explanation for the omission – that he and his father simply did not know they had to provide such detailed statements – was therefore not compelling and the agency was free to disregard it. *See Majidi v. Gonzales*, 430 F.3d 77, 80–81 (2d Cir. 2005); *see also Likai Gao*, 968 F.3d at 145.

Liang's failure to disclose (prior to cross-examination) that his friend, Xiao,

20

could vouch for his presence on the blacklist further undermined his credibility. Again, the source and timing of Xiao's knowledge concerning the blacklist was clearly relevant to Liang's alleged fear of future persecution were he to be returned to China. And the fact that Xiao, like Liang's father, made no mention of that fact in his written submission is not something the IJ was obliged to ignore.

Indeed, Liang's failure to timely disclose these important details significantly impeded the agency's factfinding capabilities. In short, the asylum process is designed to enable the agency to efficiently assess an applicant's fear of persecution and to timely ascertain the identities of witnesses who might corroborate the applicant's story. That process was thwarted here. Liang waited until the very end of his asylum review to disclose this information, and the only witnesses that Liang says could corroborate this testimony omitted it from their written statements. So, not only was Liang's new testimony suspicious in its own right, but the IJ was left with limited ability to verify it without continuing the proceedings to a later date.

While the IJ certainly had the power to continue the proceedings to collect such corroborating evidence (if any existed), *see Wei Sun*, 883 F.3d at 28–29, there was under no obligation to do so. Liang's omission concerned material

21

information that was in his possession and that he should have disclosed earlier. Disregarding the agency's adverse credibility determination, then, would mean that in situations like this one, IJs either must overlook what they suspect to be fraudulent testimony or allow applicants to create massive delays. Indeed, permitting applicants to gum up the review process in this way would undoubtedly require the agency to expend scarce administrative resources and delay the review of the thousands of applications from other individuals seeking to vindicate their own rights. Considering the totality of the circumstances, the IJ was clearly justified in concluding that Liang manufactured this belated testimony in an effort to bolster his application and fill gaps in his story. *See Xu Duan Dong*, 406 F.3d at 112.

Of course, in *Hong Fei Gao*, we drew a distinction between new testimony elicited on cross-examination and new testimony volunteered by the applicant on direct examination. *See Hong Fei Gao*, 891 F.3d at 80. While we suggested that the latter is more pernicious than the former, we did not suggest that new testimony added on cross-examination can never form the basis of an adverse credibility determination. It is simply incumbent upon the IJ to determine whether this new testimony was merely an honest response to the government's (or IJ's) question

22

or, as here, an apparent attempt by the applicant to enhance his chances of success by embellishing his story. Where it appears to be the latter, we have not hesitated to conclude that such cross-examination testimony supports an adverse credibility determination. *See, e.g.*, *Zhi Hui Zhu v. Barr*, 767 F. App'x 58, 60 (2d Cir. 2019); *Wen Cai Yang v. Sessions*, 689 F. App'x 676, 677 (2d Cir. 2017); *Gaoxiang Zhang v. Lynch*, 643 F. App'x 75, 77 (2d Cir. 2016); *Zi Xing Zhang v. Bd. of Immigration Appeals*, 230 F. App'x 78, 80 (2d Cir. 2007); *Jian De Chen v. U.S. Dep't of Justice*, 173 F. App'x 920, 922 (2d Cir. 2006); *Guo Yuan Zhou v. U.S. Dep't of Justice*, 161 F. App'x 43, 45 (2d Cir. 2005).

So, while omissions are generally less damning to an alien's credibility than an outright inconsistency, this omission was particularly concerning because it involved facts that were central to Liang's claim for asylum. Liang added new information on cross-examination that was critical to his application, and the only witnesses that Liang said could corroborate his claim had failed to do so. It was thus fair game for the IJ to conclude that Liang was attempting to pad his application with new details and colorful accounts concerning his presence on a government blacklist in China. The agency's adverse credibility determination is therefore well-supported by the record.

**B.    Asylum and Withholding of Removal**

Liang's claim that he faced persecution in China on account of his religion depended on his credibility. The agency's adverse credibility determination, then, prevents Liang from establishing past persecution. *See Likai Gao*, 968 F.3d at 149–50. But that does not mean that Liang is automatically incapable of demonstrating a likelihood of future persecution. "[S]o long as the factual predicate of [Liang's] claim of future persecution is independent of the testimony that the IJ found not to be credible," Liang can still secure asylum or withholding of removal. *Paul*, 444 F.3d at 154 (emphasis omitted).

To demonstrate a well-founded fear of future persecution, Liang had to establish that the Chinese government was aware or would become aware that he was practicing Christianity *and* would persecute him following his removal as a result. *See Hongsheng Leng v. Mukasey*, 528 F.3d 135, 143 (2d Cir. 2008). Liang could have done this either by offering testimony that he "would be singled out individually for persecution" or by proving "the existence of a pattern or practice in [China] . . . of persecut[ing]" Christians. *Id.* at 142 (internal quotation marks and alterations omitted); *see also* 8 C.F.R. § 1208.13(b)(2)(iii). Liang has done neither.

Liang's best evidence that he would be singled out for persecution following

removal is his testimony concerning his presence on the blacklist. Unfortunately, this is the precise issue on which the agency determined that Liang was not credible. His testimony on this topic is therefore tainted. *See Paul*, 444 F.3d at 154. And absent that testimony, there is nothing in the record to indicate that Liang is at a unique, individualized risk of persecution in China. As a result, Liang's asylum petition hinges on whether he has shown a pattern or practice in China of persecuting Christians.

While Liang marshals some objective evidence to that effect, it falls well below the threshold needed to secure relief. Most notably, Liang's evidence does not show a pervasive pattern of persecution across the country; according to recent country reports prepared by the State Department and relied on by Liang, the treatment of Christians in China varies by locality. *See* CAR at 52–53. And because the IJ found that none of Liang's evidence speaks to persecution occurring in Liang's home province of Fujian, he has failed to carry his burden of proof. *See Santoso v. Holder*, 580 F.3d 110, 112 (2d Cir. 2009) (denying petition where agency considered background materials and rejected pattern or practice claim because conditions varied across the country).

The agency therefore did not err in concluding that Liang failed to

demonstrate a well-founded fear of future persecution, let alone the clear probability of future persecution needed to establish withholding of removal.

## V. Conclusion

For the foregoing reasons, we **DENY** Liang's petition.